

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
06/05/2008

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **DECKER OAKS DEVELOPMENT** | § | **Case No. 07-35557** |
| **II, LTD.** | § | |
| | § | |
| **Debtor** | § | |

| | | |
|---|---|---|
| **ROYCE HOMES, L.P.** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **V.** | § | |
| | § | **Adversary No. 07-03421** |
| **DECKER OAKS DEVELOPMENT** | § | |
| **II, LTD., ROBERT WEEDN** | § | |
| **DEVELOPMENT, LTD., AND** | § | |
| **ROBERT WEEDN** | § | |
| | § | |
| **Defendant** | § | |


**MEMORANDUM OPINION ON (1) PLAINTIFF'S COMPLAINT; AND (2)**
**DEFENDANTS' COUNTERCLAIMS**
**[Docket Nos. 1 & 17]**

## I.    Introduction

Plaintiff Royce Homes, L.P.[1] (Royce Homes) filed a civil suit against Decker Oaks

Development II, Ltd., Robert Weedn (Weedn),[2] and Robert Weedn Development, Ltd.[3]

(collectively Decker Oaks) in Texas District Court alleging fraud and breach of contract arising

---

[1] Plaintiff Royce Homes, L.P. is a limited partnership with its principal place of business in Harris County, Texas.
[2] Robert R. Weedn is the president of Decker Oaks Investment Corporation, Inc.—a general partner of Decker Oaks Development II, Ltd. Weedn is the debtor in a voluntary Chapter 11 bankruptcy case assigned to this Court (Case No. 07-36955).
[3] The Court notes that Robert Weedn Development, Ltd. is not, and never was, a legal entity. [February 14, 2008 Tr. 4:25–5:5]. Robert Weedn inexplicably signed one document for "Robert Weedn Development, Ltd.," but the parties have agreed that Royce Homes is not seeking damages against "Robert Weedn Development, Ltd." *Id.* at 5:6–6:15.

from land transactions concerning two subdivisions: Saratoga Springs[4] and the Village of Decker Oaks.[5] Further, Royce Homes sought declaratory judgment that both land sale contracts were terminated and that Royce Homes was entitled to the return of the earnest money associated with the contracts.

After Decker Oaks removed the suit from Texas District Court to this Court, Decker Oaks answered that the contract for the sale of property in Saratoga Springs (the Saratoga Springs contract) was never enforceable, and that Royce Homes breached the contract for the sale of property in the Village of Decker Oaks (the Decker Oaks contract). Further, Decker Oaks brought counterclaims of slander of title, tortious interference with an existing contract, tortious interference with a prospective contract, and common law fraud arising from Royce Homes' filing of a document in the Harris County property records asserting its right to purchase Saratoga Springs (the Memorandum of Contract). Lastly, Decker Oaks alleged breach of contract in connection with both land sale contracts.

After a three-day trial, the Court finds that the Saratoga Springs contract was never valid or enforceable,[6] and as such, Royce Homes is entitled to the return of the earnest money associated with this contract. Further, the Court finds that Royce Homes' filing of and refusal to remove the Memorandum of Contract constituted slander of title and tortious interference with an existing contract. Lastly, the Court finds that Royce Homes breached the Decker Oaks

---

[4] At all times relevant to this lawsuit, Decker Oaks Development II, Ltd. was the record title owner of the approximately 149 acres of land comprising the Saratoga Springs subdivision, located in Harris County, Texas. [Docket No. 17 at 17–26]; [Docket No. 26, § V(2)].

[5] The Court notes that the parties and their contracts refer to *"Village* of Decker Oaks," *"Villages* of Decker Oaks," *"The Villages* of Decker Oaks," and *"The Village* of Decker Oaks." (emphasis added) *See, e.g.* [Decker Oaks Ex. No. 37, § 1.01] ("Villages of Decker Oaks"); [Decker Oaks Ex. No. 40] ("Village of Decker Oaks" and "The Village of Decker Oaks"). In the interest of simplicity, the Court will hereinafter refer to this subdivision as "the Village of Decker Oaks."

[6] For purposes of simplicity and clarity, the Court will use the phrase "Saratoga Springs contract" even though the proposed agreement was never valid or enforceable.

contract, and thus, pursuant to the contract, Decker Oaks is entitled to retain the applicable earnest money as damages.

The Court makes the following Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52, as incorporated into Federal Rule of Bankruptcy Procedure 7052. To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

## II.    Findings of Fact

The facts, as stipulated to or admitted by the parties, or as adduced from testimony of various witnesses, or as established by the introduction of exhibits, are as follows:

1) On July 26, 2001, Royce Homes and Decker Oaks entered into the Decker Oaks contract. [Decker Oaks Ex. No. 37 at § 1.01].[7]  This contract provided that Decker Oaks would sell 120 lots in Phase I of the Village of Decker Oaks subdivision (the Village of Decker Oaks, Section I) to Royce Homes at a cost of $18,000 per lot.  *Id.*  Pursuant to the contract, Royce Homes was to deposit $10,000.00 earnest money with Stewart Title Company (Stewart Title) within fifteen days of the contracting date.  *Id.* § 1.04.  This earnest money was to be returned after the closing of all lots.  *Id.*

2) On August 3, 2001, Royce Homes deposited $10,000.00 with Stewart Title, representing earnest money under the Decker Oaks contract.  [February 14, 2008 Tr. 63:20–64:20]; [Royce Homes Ex. No. 47].

---

[7] Reference in this memorandum opinion to "Royce Homes Ex. No. _____" and "Decker Oaks Ex. No. _____" refers to the exhibits that the parties admitted during the February 14, 15, and 22, 2008 trial before this Court.

3) On September 22, 2001, David Weber (Weber), acting for Royce Homes, executed a contract to purchase "196 single-family lots of land . . . situated in SARATOGA SPRINGS [], in HARRIS County [], Texas" from Decker Oaks. [Decker Oaks Ex. No. 1, § 1.01]; [February 15, 2008 Tr. 71:25–72:14]. The copy of the Saratoga Springs contract executed by Weber contained a handwritten modification to the interest rate.[8] *Id.* The contract provided that the lots to be sold were "more particularly described in Exhibit A attached hereto and incorporated herein by this reference for all purposes . . . ." *Id.* § 1.01. No such Exhibit A describing the lots to be sold was attached at the time of Weber's execution. [Docket No. 26, § V(3)].[9] Subsequent to Weber's execution of the Saratoga Springs contract, Royce Homes sent this contract to Decker Oaks for its execution.

4) On November 16, 2001, Robert Weedn, acting for Decker Oaks, executed a copy of the Saratoga Springs contract. [Decker Oaks Ex. No. 1, § 1.01]. Prior to signing, Weedn inserted and initialed a handwritten modification increasing the purchase price.[10] *Id.* Weedn did *not* initial the modification to the interest term inserted by Weber. *Id.* No Exhibit A describing the lots to be sold was attached at the time of Weedn's execution. [Docket No. 26, § V(3)]. After signing the Saratoga Springs contract with his changes, Weedn sent the document back to Royce Homes. Thereafter, Royce Homes deposited

---

[8] The unamended Saratoga Springs contract provides: "In addition to the Basic Price, Purchaser agrees to pay on each lot an amount calculated on the Basic Price from the Initial Closing Date, as hereinafter defined, to the date of Closing of such Lot pursuant to the terms hereof, at a rate of 8% per Lot per ANNUM, (the "Additional Consideration") payable at takedown." [Decker Oaks Ex. No. 1 at § 1.03]. Weber's handwritten modification changed the phrase "8% per Lot per ANNUM" to read "7% per Lot per ANNUM." *Id.*

[9] Unless otherwise noted, all docket references refer to the docket in Adversary Proceeding No. 07-3421.

[10] The unamended Saratoga Springs contract provides, "Seller shall sell, and Purchaser shall purchase, the Lots for $23,000 (55' X 120') and $27,000 (65' X 125') and No/100 Dollars ($) per Lot (the 'Basic Price')." Weedn's handwritten modification changed "$23,000" to "$23,500." Weedn further amended the contract to change "$27,000" to "$27,500," but he amended the contract again to return the price to "$27,000."

$25,000.00 earnest money with Stewart Title pursuant to the Saratoga Springs contract. [Royce Homes Ex. No. 45 at 2]; [Docket No. 26, § V(4)].

5) On July 15, 2003, Decker Oaks and Royce Homes executed an amendment to the Decker Oaks contract (the July Amendment). [Decker Oaks Ex. No. 40]. This amendment provided that: (a) "The 80 lots sold or available for sale in Section I are the complete obligation of [Royce Homes and Decker Oaks] for Section I and is satisfied;"[11] (b) Royce Homes agreed to purchase sixty lots in Section II of the Village of Decker Oaks subdivision (the Village of Decker Oaks, Section II) at a purchase price of $19,000.00 per lot; (c) "Upon Sellers [sic] loan commitment the earnest money is hereby amended to be [$5,000.00] and deposited [sic] with Stewart Title until the contract is fulfilled. At time of Sellers [sic] Construction Loan Commitment, additional earnest money of [$57,000.00] submitted by form of Letter of Credit shall be conveyed to Stewart Title." *Id.*

6) As of July 15, 2003, Royce Homes had not satisfied its obligation to purchase eighty lots in the Village of Decker Oaks, Section I. [February 15, 2008 Tr. 14:14–15:14, 124:8–11, 125:3–6, 126:12–24]; [February 22, 2008 Tr. 58:15–59:8, 60:16–24]. Decker Oaks sold or had available for purchase all eighty lots, but Royce Homes only closed on seventy-one lots. *Id.* Decker Oaks expected to receive approximately $160,000.00 in compensation for the last nine lots to be purchased in satisfaction of Royce Homes' contractual obligations. [February 15, 2008 Tr. 125:10–17].

---

[11] As later discussed, the Court interprets this clause to mean that the obligations of both parties are "satisfied" at the point at which Decker Oaks has sold and Royce Homes has purchased the "80 lots [previously] sold or [then] available for sale in Section I." *See* discussion *infra* Part IV(H)(i).

7) On September 29, 2003, Royce Homes deposited $5,000.00 in escrow with Stewart Title pursuant to the July Amendment. [February 14, 2008 Tr. 75:4–76:18]; [Royce Homes Ex. No. 63 at 2].

8) On October 2, 2003, Decker Oaks returned Royce Homes' $10,000.00 earnest money associated with the Decker Oaks contract. [February 14, 2008 Tr. 68:3–69:4]; [Royce Homes Ex. No. 60].

9) On October 3, 2003, Royce Homes deposited $57,000.00 in escrow with Stewart Title pursuant to the July Amendment. [February 14, 2008 Tr. 75:4–76:24]; [Royce Homes Ex. No. 63 at 2].

10) On September 3, 2004, Decker Oaks informed Royce Homes that it had not satisfied its entire obligation to purchase lots in the Village of Decker Oaks, Section I or to deposit a $57,000.00 letter of credit with Stewart Title as required by the July Amendment.[12] [Royce Homes Ex. No. 72]. Decker Oaks requested compliance with these obligations by September 14, 2004. [February 14, 2008 Tr. 79:23–80:7]; [February 15, 2008 Tr. 133:9–134:19]; [Royce Homes Ex. No. 72].

11) On September 16, 2004, Decker Oaks informed Royce Homes that it was terminating the Decker Oaks contract due to Royce Homes' failure to deposit a $57,000.00 letter of credit with Stewart Title as required by the July Amendment. [February 14, 2008 Tr. 80:20–81:9]; [Royce Homes Ex. No. 73].

12) In April, 2004, Royce Homes filed a document entitled "Memorandum of Contract" in the real property records of Montgomery County. [Decker Oaks Ex. No. 5]; [February 14, 2008 Tr. 73:17–19]. The Memorandum of Contract provided, "[t]his Memorandum of

---

[12] At trial, Weedn conceded that Decker Oaks' assertion that the $57,000.00 letter of credit was not in escrow with Stewart Title was incorrect at the time it was made. [February 22, 2008 Tr. 48:10–16].

Contract is given to evidence of public record [Royce Homes'] right to acquire [Saratoga Springs] pursuant to the terms of a Contract of Sale by and between [Decker Oaks and Royce Homes] . . . ." [Decker Oaks Ex. No. 5].

13) On January 1, 2006, Weedn posted a sign in an attempt to sell Saratoga Springs. [February 15, 2008 Tr. 141:16–25]. The sign generated contact from over twenty prospective purchasers. [February 15, 2008 Tr. 142:3–11].

14) On January 11, 2006, Royce Homes filed a copy of the Memorandum of Contract in the real property records of Harris County. [Docket No. 26, § V(6)].

15) On January 19, 2006, Steve and Rose Bryant (the Bryants) mailed a letter of intent to Decker Oaks stating the terms under which the Bryants were willing to purchase Saratoga Springs.[13] [Royce Homes Ex. No. 27].

16) On January 27, 2006, the Bryants and Decker Oaks executed a contract for the sale of Saratoga Springs. [Royce Homes Ex. No. 29]. The pertinent terms included a purchase price of $4,499,500.00, a 30-day feasibility period, and a 15-day period in which to cure title problems. *Id.* §§ 3, 6, 7. During the feasibility period (beginning at the execution of the contract), the Bryants could terminate the contract for any reason and receive their earnest money back, less $100.00. *Id.* § 7. Further, if, during the feasibility period, the Bryants lodged a complaint about the state of the realty's title, Decker Oaks had the right to cure the problem within fifteen days of the objection. *Id.* § 6.

---

[13] In the interest of convenience, the Court will refer to "Saratoga Springs" when describing both the property that was under contract to be sold to the Bryants, as well as the lots to be sold to Royce Homes under the Saratoga Springs contract. However, it is of note that the phrase "Saratoga Springs," when used in reference to the Saratoga Springs contract, is intended to refer to the lots described in the Saratoga Springs contract. In contrast, the phrase "Saratoga Springs," when used in reference to the property to be conveyed to the Bryants, is intended to refer to the entire Saratoga Springs subdivision. In other words, the Bryants were purchasing the entire subdivision, whereas Royce Homes was purchasing less than the entire subdivision.

17) On February 6, 2006, Royce Homes requested a release of the $62,000.00 earnest money deposited with Stewart Title pursuant to the July Amendment. [Royce Homes Ex. No. 79 at 2]. The request was made to Stewart Title, which forwarded the request to Decker Oaks for approval. *Id.* at 1.

18) On February 7, 2006, Decker Oaks sent a letter (the Demand Letter) to Royce Homes asserting that "Royce has no rights to purchase [Saratoga Springs] and no right to file the [Memorandum of Contract] . . . ." [Decker Oaks Ex. No. 29 at 1]. Further, the communication informed Royce Homes that "[Decker Oaks] is in the process of selling the [Saratoga Springs property] to a third party, and has it under contract to sell to that party." *Id.* Lastly, the Demand Letter requested that the Memorandum of Contract be removed from the property records or Decker Oaks would hold Royce Homes liable for damages and other costs associated with the Memorandum of Contract. *Id.* at 2–3.

19) Prior to Decker Oaks' letter of February 7, 2006, Weedn spoke on the phone with George Kopecky, Jr. (Kopecky), the president of the land development and lot acquisition arm of Royce Homes, and demanded that Royce Homes remove the Memorandum of Contract from the property records. [February 15, 2008 Tr. 156:14–22]. Kopecky refused to comply with this demand. *Id.*

20) On February 9, 2006, the Bryants were made aware of the Memorandum of Contract as the result of a title search on Saratoga Springs. [Royce Homes Ex. No. 31].

21) Prior to February 15, 2006, the Bryants had the financial means to purchase Saratoga Springs. [February 22, 2008 Tr. 10:4–8].

22) On February 15, 2006, the Bryants cancelled their contract to purchase Saratoga Springs via letter (the Letter of Cancellation). [Royce Homes Ex. No. 33 at 3]. The Letter of

Cancellation did not raise a specific objection to the state of the title to Saratoga Springs. *Id.*; [February 22, 2008 Tr. 8:2–5].   Further, the Bryants never formally raised an objection to the realty's title such that Decker Oaks' right to cure any title problems would become available.   [February 15, 2008 Tr. 198:10–16].   In pertinent part, the Letter of Cancellation provided:

> I [(Steven C. Bryant)] will continue working with my group on this opportunity but rather than object to the cloud on the title from the Royce Homes 2001 contract to get more time on my feasibility period, I would rather terminate the contract, free you up to pursue other purchasers and if the property is still available when my group is ready I will discuss a new contract with you at that time.

[Royce Homes Ex. No. 33 at 3].

23) On May 15, 2006, Decker Oaks requested a release of the $62,000.00 earnest money deposited with Stewart Title pursuant to the July Amendment.   [Royce Homes Ex. No. 81].   Decker Oaks stated that it was due the earnest money because—as asserted in Decker Oaks' letter on September 16, 2004—Royce Homes breached the July Amendment. *Id.*

24) On July 9, 2007, Royce Homes sent a letter to Decker Oaks threatening immediate litigation to recover the $62,000.00 earnest money associated with the Decker Oaks contract if the funds were not released.   [Royce Homes Ex. No. 87].

25) Subsequently, Royce Homes filed a civil suit (the State Court Suit) against Decker Oaks in Harris County District Court.[14]   [Docket No. 1 at 4–10].   In the Plaintiff's Third Amended State Court Petition, Royce Homes alleged fraud and breach of contract arising out of the Saratoga Springs contract and the Decker Oaks contract. *Id.* at 5–8.   Further,

---

[14] This cause was styled Cause No. 2006-18733, *Royce Homes, L.P. v. Decker Oaks Development II, Ltd., Robert Weedn Development, Ltd., and Robert Weedn,* in the District Court of Harris County, Texas, 164th Judicial District.

Royce Homes sought declaratory judgment that these contracts were terminated and Royce Homes was entitled to release of the associated earnest money. *Id*. at 8–9.

26) On September 17, 2007, Decker Oaks removed the State Court Suit to this Court. [Docket No. 1]. This suit was assigned Adversary Proceeding number 07-03421.

27) On December 5, 2007, Decker Oaks filed its First Amended Answer, a counterclaim against Royce Homes, and a third-party complaint against John Speer (Speer) and Hammersmith Group, Inc. (Hammersmith).[15]   [Docket No. 17].   Decker Oaks' counterclaim and third-party complaint asserted slander of title, tortious interference with an existing contract, tortious interference with a prospective contract, common law fraud, and breach of contract against Royce Homes, Speer, and Hammersmith. *Id*. at 10–14. Moreover, Decker Oaks sought declaratory relief that Royce Homes, John Speer, and Hammersmith hold no interest in Saratoga Springs. *Id*. at 9.

## III.   Credibility of Witnesses

At trial, the Court heard testimony from three witnesses: Kopecky, Weber, and Weedn.[16] Set forth below are the Court's findings regarding the credibility of each of these witnesses.

### A.  George Kopecky, Jr.

Kopecky is an employee of Royce Homes who has worked in the business of purchasing lots for residential construction for thirty-seven years.  Kopecky has served as the president of the land development and lot acquisition arm of Royce Homes for approximately five years. [February 14, 2008 Tr. 49:22–50:2].   Prior to this position, Kopecky ran Royce Homes' operating division, where he was responsible for reviewing and approving real property contracts.  [February 14, 2008 Tr. 50:4–7].

---

[15] The claims of Decker Oaks against both Speer and Hammersmith were eventually stricken, leaving Royce Homes and Decker Oaks as the only parties.  [Docket No. 30].
[16] Royce Homes called Kopecky and Weber.  Decker Oaks called Weedn.  All three witnesses were cross-examined.

Kopecky attempted to convince the Court that Weedn had no credibility by, in part, testifying that Kopecky had more trouble dealing with Weedn than any other real estate developer he had dealt with. [February 14, 2008 Tr. 62:19–63:1]. Yet, Kopecky's own arrogant and evasive behavior from time to time on the stand called into question his credibility.

For example, Kopecky's evasiveness was displayed when counsel for Decker Oaks was examining him about a key provision in the Saratoga Springs contract. Kopecky made every effort to avoid answering the question posed to him:

> [Mr. Dylewski – Counsel for Decker Oaks] You're not going to give somebody, as a developer, an open-ended right to tie up your property for decades, are you?
>
> [Kopecky] It depends.
>
> Q Well, let me just take this logically so we all understand what we're talking about here today.
> Now, are you telling this Court that the purchaser can extend the time for performance under the paragraph Roman numeral VI beyond that 90-day period by itself?
>
> A That's my belief.
>
> Q All right. And what time limit are you telling the Court that the purchaser has to finally make a decision whether they're going to go forward or not?
>
> A We made a decision when we signed the contract that we were going to go forward. We put up earnest money. And keep in mind that throughout all of these years we were in constant contact with Mr. and Mrs. Weedn and there was never anything to the contrary spoken. We still expressed our desire to perform under the contract, and they still were communicating to us and their banks that they were going to develop the property and sell the lots to us, which is why I believe we had a contract all of this time.
>
> MR. DYLEWSKI: Objection. Nonresponsive.
>
> THE COURT: I'll sustain. Go ahead and ask the question again.
>
> MR. DYLEWSKI: Let me rephrase the question.
>
> BY MR. DYLEWSKI:

Q At what time, under your view of this contract, could you keep this thing alive under the terms it was originally written with the price? Could it be ten years?

A I think it was through the period of time that -- until we sued for specific performance.

MR. DYLEWSKI: Objection. Nonresponsive.

THE COURT: I'll sustain.

BY MR. DYLEWSKI:
Q Mr. Kopecky, the question is very simple. I'm trying to get a time frame from you.
Since you say you believe you can extend that deadline in paragraph Roman numeral VI beyond that 90-day period, I'm trying to figure out, could you have extended five years?

MS. HAIR: Are you through with your question?

MR. DYLEWSKI: Yes.

MS. HAIR: Judge, I object. This is calling for a legal conclusion from a witness who is not a lawyer. Also, this line of questioning is irrelevant. There was never an extension. There was a default, and there was a suit brought, and he does not have the ability, because he's not a lawyer, to tell about the appropriate time limits for that.

MR. DYLEWSKI: Judge, this is in direct response to the questions that were elicited from this witness yesterday, who testified that there was no time limit under paragraph Roman numeral VI double A, and if he was good enough to be a lawyer yesterday, I'm going to question him about it.

THE COURT: I'll overrule the objection. I think it's fair to ask him.

BY MR. DYLEWSKI:
Q Mr. Kopecky, under your view of this contract, could the purchaser, Royce Homes, extend this contract under its original terms for five years?

A That was my belief.

Q And ten years?

A That was my belief.

Q Twenty years?

A That was my belief.

Q And you'd tie them up at the same price, then, that was signed in 2001?

A Yes.

[February 15, 2008 Tr. 28:7–31:23].

Not only was Kopecky evasive on this key point, but the following exchange reflects an arrogance that further undermines his own credibility:

[Mr. Dylewski – Counsel for Decker Oaks] All right. Early yesterday you testified that in your opinion Royce Homes took all of the lots that it was obligated to take in Village of Decker Oaks Section One. Is that your testimony?

[Kopecky] My testimony was not that it was my opinion; we have a written document from the Weedns stating that we had taken all of the lots necessary under that contract, and they, in fact, returned our earnest money on that section signifying that they were in agreement.

Q Well, that's not quite responsive, but let me ask it in a different way. How many lots was Royce obligated to take in Section One of the Village of Decker Oaks?

A Whatever the contract said, if they were substantially complete; and therein lies the problem.

Q All right. Tell me and tell the Court what lots in Section One were not substantially complete, as you understand that term.

A There were some lots that we could not purchase because we could not get a building permit. I do not know the lot numbers.

Q And –

A But because we couldn't get building permits and because we did purchase all - - we purchased all of the lots that were available to us that were substantially complete, which is what resulted in the letter from the Weedns stating that we had fulfilled our contractual obligations and releasing our earnest money to us. *It's very simple, and it's in writing. I'm not even sure why we're discussing this.*

Q Well, we're discussing it because we have a difference of opinion, Mr. Kopecky.

[February 15, 2008 Tr. 12:9–13:14] (emphasis added).

The testimony above underscores Kopecky's view of the world that there is the Royce Homes' way and the wrong way, and he should not have to be bothered with coming to court and being subject to questions about contractual dealings that Royce Homes has had with such an insignificant gadfly as Weedn.

By way of further example, Kopecky testified with great assurance that Decker Oaks breached the Decker Oaks contract by failing to build amenities, including a swimming pool. [February 15, 2008 Tr. 8:6–9:18].   Yet, on cross-examination, when asked where such a requirement could be found in the contract, Kopecky was unable to cite any such provision, and attempted to explain away his testimony by saying that he recalled seeing a plat that showed such amenities.   [February 15, 2008 Tr. 50:25–52:12].   Kopecky's haughty self-assuredness greatly exceeded his ability to cite applicable provisions in the contracts supporting his definitive view of the correctness of Royce Homes' position.

All in all, Kopecky's hubris, together with his evasiveness, undermined his credibility with this Court.   The Court finds his testimony to be less than credible, and therefore, gives little weight to his testimony.

## B.  David Weber

Weber has worked in the homebuilding industry since 1976.   Weber served as the chief financial officer and the manager of the land development department of Royce Homes from 2001 to 2004.[17]   It was Weber, in his capacity as an officer of Royce Homes, who signed the Saratoga Springs contract and the Decker Oaks contract.   Weber forthrightly and responsively answered the questions posed to him on both direct examination and cross-examination.   The Court finds his testimony to be credible and gives substantial weight to his testimony.

---

[17] At the time of trial, Weber was no longer employed by Royce Homes. [February 15, 2008 Tr. 73:16–17].

### C. Robert Weedn

Like Weber, Weedn forthrightly and responsively answered the questions posed to him on both direct examination and cross-examination. It is worth noting that Weber, who has no financial stake in assisting Weedn in this lawsuit, gave testimony about Weedn's character contrary to the testimony of Kopecky. On cross-examination by counsel for Decker Oaks about Weedn's honesty, Weber gave the following testimony:

> [Mr. Dylewski – Counsel for Decker Oaks]  Let me ask you this. During the time period that you dealt with Mr. Weedn, did you find him to be honorable?
>
> [Weber] Yeah. Yes.
>
> Q He didn't misrepresent things to you?
>
> A Well, only he would know that.
>
> Q I mean, from your perspective?
>
> A I had no problems with Robert, at this juncture.
>
> Q There were delays in some aspects of Saratoga Springs I take it?
>
> A Yes.
>
> Q And he worked through those?
>
> A Yes.
>
> Q He stayed on it, working with the city of Tomball to go get approval, you remember all that?
>
> A Yes.

[February 15, 2008 Tr. 93:18–94:7].    The Court finds Weedn's testimony to be credible and gives substantial weight to his testimony.

## IV.    Conclusions of Law

### A.  Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b)(1). This dispute is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), and (O). As such, this Court may enter a final judgment. 28 U.S.C. § 157(b)(1); *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1421 (5th Cir. 1995). In the alternative, if this proceeding is actually non-core, the Court still maintains full adjudicative power because the parties consented in the Joint Pretrial Statement to the entry of a final judgment by this Bankruptcy Court. [Docket No. 26, § II]; *see also Matter of Hipp, Inc.*, 895 F.2d 1503, 1517 (5th Cir. 1990). Venue is proper pursuant to 28 U.S.C. § 1409(a).

### B. Validity of the Saratoga Springs Contract

#### 1. The Saratoga Springs contract failed for lack of mutual assent.

Contract formation requires a mutual understanding and assent to the agreement by the contracting parties. *Willowood Condo. Ass'n, Inc. v. HNC Realty Co.*, 531 F.2d 1249, 1251 (5th Cir. 1976) (applying Texas law); *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 530 (Tex. App.—Houston [1st Dist.] 2007, no pet.). "Mutual assent, concerning material, essential terms, is a prerequisite to formation of a binding, enforceable contract." *Id.* (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)). "The essential elements [of a contract] for the sale of real property are the price, the property description, and the seller's signature." *Rus-Ann Dev., Inc. v. ECGC, Inc.*, 222 S.W.3d 921, 927 (Tex. App.—Tyler 2007, no pet.). "[T]here is no enforceable contract where the agreement of the parties leaves an essential term for later determination and it is never determined." *Mooney v. Ingram*, 547 S.W.2d 314, 317 (Tex. Civ. App. 1977, *writ ref'd n.r.e.*). The presence of mutual assent is determined "based on objective standards of what the parties said and did and not on their alleged subjective states of mind." *Am. Nat'l Ins. Co. v. Paul*, 927 S.W.2d 239, 244 (Tex. App.—Austin 1996, writ

denied) (quoting *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 717 (Tex. App.—Houston [1st Dist.] 1988, writ denied)); *Alred v. Borden, Inc.*, 1996 WL 670327, at *5 (5th Cir. Nov. 8, 1996) (per curiam) (unpublished opinion) (applying Texas law).

During negotiations regarding Saratoga Springs, Royce Homes and Decker Oaks never arrived at the mutual understanding necessary for contract formation. The proposed contract's terms were reduced to writing—this Opinion refers to this document as the Saratoga Springs contract—but no objective manifestation of a mutual agreement was ever displayed. In reality, the parties objectively displayed a disassociation of their intentions regarding the contract. Specifically, Royce Homes and Decker Oaks each signed a version of the Saratoga Springs contract containing *materially different terms*. On September 22, 2001, Weber, acting as a representative of Royce Homes, inserted a handwritten modification of the interest rate into the Saratoga Springs contract and signed it. [Finding of Fact No. 3]. On November 16, 2001, Decker Oaks executed a copy of the Saratoga Springs contract, but only after modifying the price to be paid for each lot. [Finding of Fact No. 4]. Neither party initialed the other party's modifications, nor was mutual agreement on the purchase price or the interest rate ever reached. [February 15, 2008 Tr. 135:17–23, 170:1–4]. Thus, as the parties never objectively manifested an agreement regarding the contract's material terms, the Saratoga Springs contract must fail for want of mutual assent. *See Willowood*, 531 F.2d at 1251; *Potcinske*, 245 S.W.3d at 530 ("Mutual assent, concerning material, essential terms, is a prerequisite to formation of a binding, enforceable contract."); *Rus-Ann Dev.*, 222 S.W.3d at 927 (price is an essential term in a contract to sell real property).

**2. The Saratoga Springs contract does not satisfy the Statute of Frauds.**

A contract for the sale of real property is enforceable only if it satisfies the Statute of Frauds. TEX. BUS. & COM. CODE ANN. § 26.01 (Vernon Supp. 2007). Under the Statute of Frauds, a contract "must furnish . . . the means or data by which the [property] to be conveyed may be identified with reasonable certainty." *Long Trusts v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006) (quoting *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972)); *James v. Nico Energy Corp.*, 838 F.2d 1365, 1369 (5th Cir. 1988) (applying Texas law). Extrinsic evidence may be used to identify the property from the information stated in the contract, but may not, by itself, supply the actual location of the property in question. *Long Trusts*, 222 S.W.3d at 416. In the suit at bar, the Saratoga Springs contract does not satisfy the Statute of Frauds because: (1) it lacks a sufficient property description on its face; (2) it did not incorporate the document that Royce Homes asserts is the "Exhibit A" mentioned in the Saratoga Springs contract (the Saratoga Ranch list) by reference; and (3) even if the Saratoga Ranch list were incorporated by reference, the two documents together do not contain a property description sufficient to satisfy the Statute of Frauds.

### a. The Saratoga Springs contract does not contain a sufficient property description on its face.

To satisfy the Statute of Frauds, a contract for the sale of real property must supply a means to identify the subject realty with reasonable certainty. *Nico Energy*, 838 F.2d at 1369; *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983). While a metes and bounds description is not required, simply describing "an unidentified portion of a larger, identifiable tract is not sufficient." *Tex. Builders v. Keller*, 928 S.W.2d 479, 481–82 (Tex. 1996) (citing *Morrow*, 477 S.W.2d at 540 ("north acreage . . . out of the 145.8 acre tract of the Jefferson McGrew Survey No. 245"); *Matney v. Odom*, 147 Tex. 26, 210 S.W.2d 980, 982 (1948) ("four (4) acres out of the East end of a ten-acre block on the P. Chireno Survey"); *Greer v. Greer*, 144 Tex. 528, 191

S.W.2d 848, 850 (1946) ("70 acres of land, more or less, out of the A.N. McKnight Survey, Patent No. 736, Volume 3, Abstract No. 400"); *Smith v. Sorelle*, 126 Tex. 353, 87 S.W.2d 703, 706 (1935) ("100 acres out of blocks eight and nine of the subdivision of Jose Maria Pineda survey . . . Pat. 608, Vol. 2"); *Pfeiffer v. Lindsay*, 66 Tex. 123, 1 S.W. 264, 265 (1886) ("50 acres of land out of the J.M. Moss survey, situated in Montague county, Texas, abstract No. 462")); *Blanco, Inc. v. Porras*, 897 F.2d 788, 791–92 (5th Cir. 1990) (applying Texas law).

The Saratoga Springs contract, standing alone, describes an "unidentified portion of a larger, identifiable tract." Within the four corners of the Saratoga Springs contract, the property is identified as "196 single-family lots of land . . . situated in SARATOGA SPRINGS [], in HARRIS County [], Texas." The Saratoga Springs contract contains no further means to identify the 196 lots to be sold (such as lot size, location, boundaries, or lot shape). Under this description, the subject realty could be *any* 196 single-family lots in Saratoga Springs in Harris County, Texas. As such, the description within the four corners of the contract is, at best, an unidentified portion (196 lots) of a larger, identifiable tract (Saratoga Springs)—a description which the Texas Supreme Court has stated is insufficient for the purposes of the Statute of Frauds. *Blanco*, 897 F.2d at 791–92; *Keller*, 928 S.W.2d at 481–82.

### b. The Saratoga Ranch list was not incorporated by reference into the Saratoga Springs contract.

The Statute of Frauds requires a written memorandum which "contains all of the essential elements of [an] agreement," but this "written memorandum . . . need not be contained in one document." *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995) (citations omitted); *Document Imaging, Inc. v. IPRO, Inc.*, 952 F. Supp. 462, 467 (S.D. Tex. 1996) (applying Texas law). However, before a document may be supplemented by a second document to satisfy the Statute of Frauds, the "instruments must show on their faces, either by express reference to each

other or by reference to the same subject matter, their connection one with the other." *Douglass v. Tex.-Canadian Oil Corp.*, 141 Tex. 506, 509, 174 S.W.2d 730, 731 (Tex. 1943); *Nat'l Presort Servs., Inc. v. ACS State and Local Solutions, Inc.*, 176 Fed. Appx. 543, 548 (5th Cir. 2006) (unpublished opinion) (applying Texas law).   "The connection must be apparent from a comparison of the writings themselves." *Douglass*, 174 S.W.2d at 731; *see also Nat'l Presort Servs.*, 176 Fed. Appx. at 548 (Under Texas law, an intent to incorporate documents by reference must be "plainly expressed."). The Saratoga Springs contract and the Saratoga Ranch list do not display such a connection, and as such, are not a single memorandum for the purposes of the Statute of Frauds.

Initially, the Saratoga Springs contract makes explicit reference to a list of particularly described lots to be sold contained in "Exhibit A." [Decker Oaks Ex. No. 1, § 1.01].  Royce Homes contends that the Saratoga Ranch list contains this list of lots.  *See* [Decker Oaks Ex. No. 2].  However, while the Saratoga Springs contract provides that Exhibit A was "incorporated herein by . . . reference for all purposes," nowhere in the Saratoga Ranch list does it mention an intent to incorporate with (or even the existence of) the Saratoga Springs contract.  *Id.*  In fact, there is a patent disassociation between these two documents.  Specifically, the Saratoga Springs contract expressly refers to "Exhibit A" as containing the list of lots to be sold, while the Saratoga Ranch list does not contain any indication that it is meant to be "Exhibit A" (nor does it make *any* mention of the Saratoga Springs contract).

Second, the Saratoga Springs contract and the Saratoga Ranch list do not display a connection between the two documents by reference to the same subject matter.  The Saratoga Springs contract explicitly pertains to the sale of "196 single-family lots of land." [Decker Oaks Ex. No. 1, § 1.01].  This provision stands in contrast to the Saratoga Ranch list, which describes

only eighty-one lots. [Decker Oaks Ex. No. 2]. Further, the Saratoga Springs contract—as originally written and signed by Weber on behalf of Royce Homes—states that the parties agree to the purchase price of $23,000.00 for each 55 foot by 120 foot (55' x 120') lot and $27,000.00 for each 65' x 125' lot. [Decker Oaks Ex. No. 1 at § 1.02]. While the Saratoga Ranch list provides for 55' x 120' lots, it does not mention any lots that are 65' x 125'. Further, the Saratoga Ranch list provides for 75' x 120' and 55' x 140' lots, two lot sizes which are not mentioned in the Saratoga Springs contract. Lastly, the Saratoga Springs contract lists the price of a 55' x 120' lot as $23,000.00, while the Saratoga Ranch list prices lots of this size at $23,500.00 each.[18] As the number of lots, the lot sizes, and the lot prices all differ, the Court concludes that the Saratoga Springs contract and the Saratoga Ranch list do not refer to the same subject matter. As such, the documents cannot be deemed a single memorandum for the purposes of the Statute of Frauds.

### c. The Saratoga Springs contract, even when supplemented by the Saratoga Ranch list, does not contain a sufficient property description to satisfy the Statute of Frauds.

Texas law requires that a contract for the sale of real property identify its subject matter with reasonable certainty. *Nico Energy*, 838 F.2d at 1369; *W. Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 265–66 (Tex. App.—Austin 2002, no pet.). The description does not have to be mathematically specific. *Templeton v. Dreiss*, 961 S.W.2d 645, 659 (Tex. App.—San Antonio 1998, pet. denied) *see also Patterson v. F.D.I.C.*, 918 F.2d 540, 546 (5th Cir. 1990). However, a property description must "furnish enough information to locate the general area as in identifying it by tract survey and county," as well as describing "the size, shape, and boundaries" of the

---

[18] The Court notes that the Saratoga Springs contract, as amended and initialed by Robert Weedn on behalf of Decker Oaks, lists the price of a 55' x 120' lot as $23,500.00—the same sale price listed in the Saratoga Ranch list. However, this fact is of minimal value because the Saratoga Springs contract, as originally executed by Royce Homes, did not have such an amendment. Therefore, the Saratoga Springs contract and the Saratoga Ranch list, at the time that Royce Homes executed the contract, appear not to describe the same property.

property.  *Reiland v. Patrick Thomas Props., Inc.*, 213 S.W.3d 431, 437 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

In the alternative, assuming *arguendo* that the Saratoga Springs contract incorporated the Saratoga Ranch list by reference, the combined documents still fail to satisfy the Statute of Frauds.  This is because the Saratoga Springs contract pertains to the sale of 196 lots, whereas the Saratoga Ranch list describes only eighty-one lots.  Thus, even if the Saratoga Ranch list described its contents to a mathematical certainty, 115 lots[19] would remain without *any* description beyond the (insufficient) language in the Saratoga Springs contract.  *See* discussion *supra* Part IV(B)(ii)(1).  Under such circumstances, the Saratoga Springs contract, as supplemented by the Saratoga Ranch list, does not contain a sufficient property description to satisfy the Statute of Frauds.[20]

### d. Royce Homes' assertion that Decker Oaks is estopped from denying the validity of the Saratoga Springs contract under the Statute of Frauds lacks merit.

#### i. Royce Homes has not waived the affirmative defense of estoppel.

Both Texas and federal law provide that estoppel is an affirmative defense.  TEX. R. CIV. P. 94; FED. R. CIV. P. 8(c); FED. R. BANKR. P. 7008(a) (applying Federal Rule of Civil Procedure 8 to adversary proceedings).  State law may govern the substantive aspects of affirmative defenses in the suit at bar, but the Federal Rules of Civil Procedure control how and when

---

[19] The 115 lots represent the 196 lots from the Saratoga Springs contract less the eighty-one lots from the Saratoga Ranch list.

[20] Moreover, even if the parties subjectively intended the Saratoga Ranch list to somehow describe all 196 lots mentioned in the Saratoga Springs contract, the Statute of Frauds would still not be satisfied.  Under Texas law, even if the parties both subjectively understood the property to be conveyed, it is the objective description which must satisfy the Statute of Frauds.  *Reiland v. Patrick Thomas Props., Inc.*, 213 S.W.3d 431, 437 (Tex. App.— Houston [1st Dist.] 2006, pet. denied) ("Even when 'the record leaves little doubt that the parties knew and understood what property was intended to be conveyed, . . . [for the purposes of the Statute of Frauds,] the knowledge and intent of the parties will not give validity to the contract . . . .'" (quoting *Morrow v. Shotwell*, 477 S.W.2d 538, 540 (Tex. 1972)).

affirmative defenses must be raised, and when waiver of these defenses occurs. *Simon v. U.S.*, 891 F.2d 1154, 1156 (5th Cir. 1990); *Funding Sys. Leasing Corp. v. Pugh*, 530 F.2d 91, 95 (5th Cir. 1976).   Under the Federal Rules of Civil Procedure, affirmative defenses should be asserted in a response to a pleading.  *Id.*; *Lucas v. U.S.*, 807 F.2d 414, 417 (5th Cir. 1986) (Federal Rule of Civil Procedure 8(c) "requires that an affirmative defense be set forth in a defendant's responsive pleading.").

In the dispute at bar, Royce Homes did not present the affirmative defense of estoppel to this Court in a responsive pleading.[21]   However, under pertinent case law, Royce Homes' estoppel argument is not waived.  Specifically, the Fifth Circuit has stated:

> Although failure to raise an affirmative defense under rule 8(c) in a party's first responsive pleading "generally results in a waiver . . . , [w]here the matter is raised in the trial court in a manner that does not result in unfair surprise ... technical failure to comply precisely with Rule 8(c) is not fatal."  Thus, a defendant does not waive an affirmative defense if he "raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond."

*Giles v. Gen. Elec. Co.*, 245 F.3d 474, 491–92 (5th Cir. 2001) (citations omitted) (omissions and insertions in original).  Further, an affirmative defense such as estoppel is not waived if evidence in support of the defense was introduced without objection by an adverse party.  *Jones v. Miles*, 656 F.2d 103, 107 n.7 (5th Cir. 1981) ("[I]n practice an affirmative defense is not waived to the extent that the party who should have pled the defense introduces evidence in support thereof without objection by the adverse party.").

In the suit at bar, Royce Homes did not present the affirmative defense of estoppel in its first responsive pleading filed in this adversary proceeding.  However, at trial, Royce Homes

---

[21] Royce Homes asserts that "estoppel was pled . . . in Plaintiff's First Amended Original Petition."  [February 22, 2008 Tr. 115:16–18].  However, the Plaintiff's First Amended Original Complaint was not attached to the Notice of Removal, and no such pleading was ever presented to this Court. [Docket No. 1].  Plaintiff's Third Amended Petition was filed in this Court, but it contains no mention of estoppel.  *See Id.* at 4.

presented evidence pertinent to the defense of estoppel without objection from Decker Oaks. Furthermore, Decker Oaks has not asserted a prejudice in its ability to respond or an unfair surprise arising from Royce Homes' tardiness in asserting estoppel. In the absence of such assertions, a party will not be deemed to have waived an affirmative defense. *Id.* ("Neglect to affirmatively plead the defense is simply noncompliance with a technicality and does not constitute a waiver where there is no claim of surprise."). As such, Royce Homes has not waived the affirmative defense of estoppel, and this Court will address the issue on the merits.

### ii. Decker Oaks is not estopped from asserting the Statute of Frauds as a defense.

Estoppel is an equitable remedy used to avoid injustice. *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 864 n.11 (5th Cir. 1999) (applying Texas law); *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965). The party asserting the affirmative defense of estoppel must establish:

> (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) to a party without knowledge, or the means of knowledge, of those facts; (4) with the intention that it should be acted on; and (5) the party to whom it was made must have relied or acted on it to his prejudice.

*In re A.L.G.*, 229 S.W.3d 783, 786 (Tex. App.—San Antonio 2007, no pet.); *In re Webber*, 350 B.R. 344, 375 (Bankr. S.D. Tex. 2006) (applying Texas law). In the present suit, none of the five elements of estoppel are satisfied.

### a) False representation or concealment of material fact

The initial element of estoppel is a false representation or concealment of a material fact by the party against whom the estoppel is sought. *Crown Life Ins. Co. v. Reliable Mach. & Supply Co.*, 427 S.W.2d 145, 150 (Tex. Civ. App.—Austin 1968, writ refused n.r.e.).

Concealment of a fact only satisfies this element if a "person is under a duty to another to speak, but refrains from doing so." *Storms v. Tuck*, 579 S.W.2d 447, 452 (Tex. 1979); *Webber*, 350 B.R. at 376.  The duty to speak only arises where a "confidential or fiduciary relationship exists between the parties."  *Bank of Am. v. Haag*, 37 S.W.3d 55, 58 (Tex. App.—San Antonio 2000, no pet.); *Webber*, 350 B.R. at 376.

This element is not satisfied in the present proceeding.  Decker Oaks made no false representation of material fact regarding the validity of the Saratoga Springs contract. Furthermore, Royce Homes did not assert that a confidential or fiduciary relationship existed between the parties such that Decker Oaks had a duty to disclose.[22]  Lastly, even if a duty to disclose was present, Royce Homes did not assert that Decker Oaks concealed any material facts. Under such circumstances, the first element of estoppel cannot be satisfied.

### b)  Made with knowledge, actual or constructive, of those facts

As discussed above, Royce Homes has not shown that a false representation or concealment of a material fact was made by Decker Oaks.  As no such actions have been evidenced before the Court, it necessarily follows that no assertion or concealment was made with knowledge of those facts.  Therefore, this element of estoppel is not satisfied.

### c)  To a party without knowledge, or the means of knowledge, of those facts

---

[22] The Court notes that "[c]ontracting parties are generally not fiduciaries." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006); *Cleveland Const., Inc. v. Centex Const. Co., Inc.*, 2005 WL 1131168, at *2 (N.D. Tex. May 11, 2005) (unpublished opinion) (applying Texas law) ("When confronted with an allegation of a fiduciary relationship between contracting parties, 'to give full force to contracts, [courts] do not create such a [fiduciary] relationship lightly.'") (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997)). Further, "the fact that one businessman trusts another and relies on another to perform a contract does not give rise to a confidential relationship." *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 670 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992)); *Sabre, Inc. v. Lyn-Lea Travel Corp.*, 2003 WL 22203707, at *5 (N.D. Tex. Sept. 23, 2003) (unpublished opinion) (applying Texas law).

The same logic applied in section (ii) applies to this element. Absent a showing of a false representation or concealment of a material fact by Decker Oaks, it is impossible to satisfy this element. Alternatively, no evidence was presented to the Court that Decker Oaks held material information that Royce Homes did not have or did not have the means to obtain. As such, this element of estoppel is not satisfied.

### d) With the intention that it should be acted on

Yet again, the logic expressed in section (ii) is applicable to this element of estoppel. Absent a false representation or concealment of a material fact by Decker Oaks, an element of intent associated with that representation or concealment cannot be satisfied. In the alternative, Royce Homes presented no evidence that Decker Oaks acted with the intent to induce Royce Homes to act. As such, this element of estoppel is not satisfied.

### e) The party to whom it was made must have relied or acted on it to his prejudice

Lastly, as was the case with the previous elements of estoppel, absent a showing of a false representation or concealment of a material fact by Decker Oaks, this element cannot be satisfied. In the alternative, Royce Homes presented no evidence that it relied or acted on a misrepresentation or concealment of material fact by Decker Oaks to its prejudice. Therefore, this element of estoppel is not satisfied.

In summation, Royce Homes is unable to satisfy any of the five elements of estoppel. Therefore, Decker Oaks is not estopped from asserting the Statute of Frauds as a defense.[23]

---

[23] In the alternative, Royce Homes cannot utilize an estoppel argument to defeat Decker Oaks' Statute of Frauds defense because "estoppel cannot create a right that does not otherwise exist." *Argyle Indep. School Dist. ex rel. Bd. of Trustees v. Wolf*, 234 S.W.3d 229 (Tex. App.—Fort Worth 2007, no pet. h.) (citing *Odessa Tex. Sheriff's Posse, Inc. v. Ector County*, 215 S.W.3d 458, 470 (Tex. App.—Eastland 2006, pet. denied); *Dallas Cent. Appraisal Dist. v. GTE Directories Corp.*, 905 S.W.2d 318, 322 (Tex. App.—Dallas 1995, writ denied)); *Oliver Res. PLC v. Int'l Fin. Corp.*, 62 F.3d 128, 131 (5th Cir. 1995) (applying Texas law). The Saratoga Springs contract does not satisfy the Statute of Frauds, and as such, creates no enforceable rights. *See* discussion *supra* Part IV(B)(ii)(1–3); TEX. BUS. & COM. CODE ANN. § 26.01 (Vernon Supp. 2007). Thus, it follows that Royce Homes may not utilize the equitable

### C. Slander of Title

Decker Oaks asserts that Royce Homes' filing of the Memorandum of Contract constituted slander of title such that Royce Homes is liable for damages. The Court agrees.

Texas law defines slander of title as a "false and malicious statement made in disparagement of a person's title to property which causes special damages." *Marrs & Smith P'ship v. D.K. Boyd Oil & Gas Co.*, 223 S.W.3d 1, 20 (Tex. App.—El Paso 2005, pet. denied); *Jeanes v. Henderson*, 703 F.2d 855, 860 (5th Cir. 1983) (applying Texas law). The elements of slander of title are: "1) the utterings and publishing of disparaging words; 2) that they were false; 3) that they were malicious; 4) that special damages were sustained thereby; 5) that the plaintiff possessed an estate or interest in the property disparaged; and 6) the loss of a specific sale." *Williams v. Jennings*, 755 S.W.2d 874, 879 (Tex. App.—Houston [14th Dist.] 1988, writ denied); *Kickham Group, Inc. v. Am. Nat'l Fire Ins. Co.*, 1997 WL 600710, at *5 (N.D. Tex. Sept. 24, 1997) (unpublished opinion) (applying Texas law). In the present suit, Decker Oaks has met its burden of satisfying all of the elements of slander of title.

### 1. The publication of disparaging words

Under Texas law, recording of an interest in property constitutes a publication for the purposes of slander of title. *Williams*, 755 S.W.2d at 879 (citing *Warner v. Winn*, 145 Tex. 302, 197 S.W.2d 338 (1946)). Royce Homes' Memorandum of Contract was recorded in the property records of both Montgomery and Harris Counties, and therefore was published. Further, a publication is deemed disparaging where a cloud on a title is recorded such that a property interest cannot be sold. *Id.* ("[A]ppellee's title was disparaged in that she could not enter into a mineral lease until [the] cloud on her title was removed."). As evidenced by Decker Oaks'

---

defense of estoppel to create rights that do not exist under an unenforceable Saratoga Springs contract. As such, Royce Homes' assertion of estoppel against Decker Oaks' use of the Statute of Frauds is improper.

inability to consummate the sale of Saratoga Springs to the Bryants, the Memorandum of Contract had this effect on Saratoga Springs. *See* discussion *infra* Part IV(C)(iv, vi). Thus, Royce Homes' filing of the Memorandum of Contract constitutes the publication of disparaging words, and therefore, the first element of slander of title is satisfied.

### 2.   The disparaging words were false

Royce Homes' Memorandum of Contract asserted that "[Royce Homes had a] right to acquire [Saratoga Springs] pursuant to the terms of a Contract of Sale by and between [Royce Homes and Decker Oaks] dated effective November 16, 2001." [Royce Homes Ex. No. 47]. As previously discussed, Royce Homes did not have such a right to acquire Saratoga Springs when it filed the Memorandum of Contract or when it refused to remove the filing. *See* discussion *supra* Part IV(B). Thus, the published words were false, and this element of slander of title is satisfied.

### 3.   The disparaging words were malicious

To satisfy the malice requirement in a slander of title suit, the proponent must show that the disparaging statement was made with "legal malice." *Duncan Land Expl., Inc. v. Littlepage*, 984 S.W.2d 318, 332 (Tex App.—Fort Worth 1998, pet. denied). Legal malice is defined as a deliberate act undertaken without reasonable cause. *Id.* (citing *Williams*, 755 S.W.2d 874, 879 (Tex. App.—Houston [14th Dist.] 1988, writ denied)). Moreover, legal malice has been described as "making false statements regarding title in absence of color of title or a reasonable belief that parties have title." *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 127 (Tex. App.—El Paso 1997, pet. denied). Further, a refusal to "release a purported, though not actual, property interest" can satisfy this element of slander of title. *Coppock & Teltschik v. Mayor, Day & Caldwell*, 857 S.W.2d 631, 639 (Tex. App.—Houston [1st Dist.] 1993, writ denied); *Ellis v.*

*Waldrop*, 656 S.W.2d 902 (Tex. 1983); *Reaugh v. McCollum Exploration Co.*, 139 Tex. 485, 163 S.W.2d 620, 622 (1942) (finding slander of title where defendant filed an invalid lease and refused to release it).

In the Memorandum of Contract, Royce Homes asserted that it had the right to purchase Saratoga Springs. This filing constitutes a misstatement of fact that is pertinent to the title of the subject realty. *See* discussion *supra* Part IV(B).

Further, the false statement was made in the absence of color of title or a reasonable belief that Royce Homes had any interest in the property. Color of title is present where a party holds a written instrument that appears to give title but does not. *See Smith v. U.S.*, 153 F.2d 655, 660–61 (5th Cir. 1946); *Surkey v. Qua*, 173 S.W.2d 230, 232 (Tex. Civ. App.—San Antonio 1943, writ ref'd w.o.m.). Royce Homes never held an instrument granting it title to Saratoga Springs; *at most*, it had possession of a proposed contract for the sale of land which was never executed by all parties.[24] Thus, Royce Homes was not acting under color of title in filing the Memorandum of Contract or refusing to remove such.

Moreover, in undertaking these actions, Royce Homes was not acting under a reasonable belief that it held a property interest in Saratoga Springs. Kopecky has worked at Royce Homes for over thirty years, and as such, is very sophisticated and has significant experience with land transactions such as the one at bar. [February 14, 2008 Tr. 49:3–50:7]. Such experience—in light of the factual basis of the suit at bar—would lead a reasonable person to believe that no

---

[24] As previously discussed, Royce Homes never held a valid contract for the purchase of Saratoga Springs. *See* discussion *supra* Part IV(B). The amended version of the Saratoga Springs contract executed by Decker Oaks constituted a counteroffer that Royce Homes never manifested the intent to accept. *See Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 208 (5th Cir. 1998) (applying Texas law); *Gasmark, Ltd. v. Kimball Energy Corp.*, 868 S.W.2d 925, 929 (Tex. App.—Fort Worth 1994, no writ) ("If [an] acceptance modifies a term of the offer, there is no agreement and the modified acceptance becomes a counteroffer.").

transfer of title had actually occurred.[25]  In the absence of color of title or a reasonable belief that

a party has title, a refusal to release a purported, though invalid, claim to an interest in land is an

act done with legal malice.  *See Heritage Res.,* 964 S.W.2d at 127; *Coppock & Teltschik*, 857

S.W.2d at 639.  As Royce Homes committed such an act, it has exhibited legal malice, and this

element of slander of title is satisfied.

### 4.  Special damages were sustained

"Special damages are those damages that proximately, naturally, and reasonably result

from the alleged slander." *Duncan Land Expl.*, 984 S.W.2d at 333; *Kickham*, 1997 WL 600710,

at *5 (N.D. Tex. Sept. 24, 1997) (unpublished opinion) (applying Texas law).  Special damages

are present where the asserting party can display a "specific, pending sale that was defeated by

the slander." *Duncan Land Expl.*, 984 S.W.2d at 333; *Sun Water Sys., Inc. v. Vitasalus, Inc.*,

2007 WL 820280, at *5 (N.D. Tex. Mar. 8, 2007).

In the present proceeding, Decker Oaks entered into a contract for the sale of Saratoga

Springs to the Bryants.  [Royce Homes Ex. No. 27].  However, after a title inspection, the

Plaintiff's Memorandum of Contract was discovered by the Bryants.  [Royce Homes Ex. No.

31].  Due to this discovery, the Bryants stated that they no longer desired to purchase Saratoga

Springs and terminated the contract.  As such, the requirement of special damages is satisfied

because Decker Oaks is able to display the loss of a specific sale due to the published words.

### 5.  The plaintiff possessed an interest in the property disparaged

---

[25] This conclusion is based upon the testimony of Kopecky in light of the factual elements of the suit at hand,
including the failure of the Saratoga Springs contract to reasonably describe the property to be sold, the failure of
both parties to initial the handwritten changes on the contract, and the general failure of both parties to take any
affirmative action indicating that contractual obligations existed.

It is uncontested that, at all times relevant to this lawsuit, Decker Oaks was the record owner of Saratoga Springs. [Docket No. 26, § V(4)]. Therefore, this element of slander of title is satisfied.

### 6. The loss of a specific sale

As discussed above, Decker Oaks lost a specific sale of Saratoga Springs as a result of Royce Homes' filing of the Memorandum of Contract. *See* discussion *supra* Part IV(C)(iv, vi). As such, this element of slander of title is satisfied.

In summation, Decker Oaks has displayed a legally malicious publication of false and disparaging words about Saratoga Springs that caused special damages (the loss of the sale of Saratoga Springs). As such, Decker Oaks has successfully established a cause of action for slander of title. *See Williams v. Jennings*, 755 S.W.2d 874, 879 (Tex. App.—Houston [14th Dist.] 1988, writ denied).

### D. Tortious Interference with an Existing Contract

Decker Oaks asserts that Royce Homes tortiously interfered with Decker Oaks' contract with the Bryants for the sale of Saratoga Springs. Specifically, Decker Oaks asserts that Royce Homes' filing of, and refusal to remove, the Memorandum of Contract constituted tortious interference. The Court agrees.

A civil suit for tortious interference with an existing contract centers around the concept that "a contract is a property right subject to protection from unwarranted interference." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings*, 219 S.W.3d 563, 588 (Tex. App.—Austin 2007, pet. denied) (citing *Raymond v. Yarrington*, 96 Tex. 443, 73 S.W. 800, 803 (1903)). The elements of tortious interference with an existing contract are: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that

proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs.*, 29 S.W.3d 74, 77 (Tex. 2000); *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 2008 WL 865090, at *11 (N.D. Tex. Mar. 17, 2008) (applying Texas law). In the present suit, Decker Oaks has met its burden of establishing each of the elements of tortious interference with an existing contract.

### 1. An existing contract subject to interference

A suit for tortious interference with an existing contract requires a valid contract. *York Group, Inc. v. Horizon Casket Group, Inc.*, 2007 WL 2120419, at *2 (S.D. Tex. July 10, 2007) (applying Texas law); *S & A Marinas, Inc. v. Leonard Marine Corp.*, 875 S.W.2d 766, 768 (Tex. App.—Austin 1994, writ denied). "A cause of action for tortious interference will not lie in the absence of a contract." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings*, 219 S.W.3d 563, 588 (Tex. App.—Austin 2007, pet. denied). On January 27, 2006, Decker Oaks and the Bryants executed a contract for the sale of Saratoga Springs. [Royce Homes Ex. No. 29]. As such, this element of tortious interference with an existing contract is satisfied.

### 2. A willful and intentional act of interference with the contract

Tortious interference with an existing contract requires that the defendant act with the intent to interfere a contract, not merely the intent to do the act that was done. *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 864 (5th Cir. 2004) (applying Texas law); *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992). The defendant must actually be aware of the existing contract to be liable. *Spectrum Creations, L.P. v. Carolyn Kinder Int'l, LLC*, 514 F. Supp. 2d 934, 945 (W.D. Tex. 2007) (applying Texas law); *Sabine Prod. Co. v. Frost Nat'l Bank*, 596 S.W.2d 271, 275 (Tex. Civ. App.—Corpus Christi 1980, writ dism'd). The intent to interfere can be inferred from circumstantial evidence. *Yeager v. TRW, Inc.*, 984 F.

Supp. 517, 523 (E.D. Tex. 1997) ("[A] plaintiff may prove malice sufficient to establish intent to harm through circumstantial evidence.") (applying Texas law); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986); *Garcia v. C.F. Jordan, Inc.*, 881 S.W.2d 155, 158 (Tex. App.—El Paso 1994, no writ). Further, liability will only attach if the defendant "knowingly [induced] one of the contracting parties to breach its obligations."[26] *John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 730 (Tex. App.—Austin 2000, pet. denied) (citing *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993)). To satisfy this burden the plaintiff must show "that the defendant took an active part in persuading a party to a contract to breach it." *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App.—Eastland 1992, writ denied) (emphasis omitted); *Sanitec Indus. Inc. v. Micro-Waste Corp.*, 2006 WL 1544529, at *6 (S.D. Tex. June 2, 2006) (unpublished opinion) (applying Texas law).

On February 7, 2006—more than a week before the Bryants terminated their contract to purchase Saratoga Springs—Decker Oaks sent the Demand Letter to Royce Homes. This letter asserted that Royce Homes had no right to file the Memorandum of Contract, informed Royce Homes that Decker Oaks was under contract to sell Saratoga Springs to the Bryants, and requested that the Memorandum of Contract be removed from the property records. [Decker Oaks Ex. No. 29]. Further, even before the Demand Letter was sent, Weedn spoke with Royce Homes (Kopecky) and requested that the Memorandum of Contract be removed from the

---

[26] The Court notes that the Bryants terminated their contract to purchase Saratoga Springs pursuant to the terms of the contract. *See* [Royce Homes Ex. No. 29, § 7] (providing for a thirty-day feasibility period during which the Bryants could terminate the contract for any reason). As such, in the strictest terms, the Bryants did not "breach" their contract with Decker Oaks, and therefore, Royce Homes did not induce the Bryants to "breach" their contractual obligations. *See Hoover v. Gregory*, 835 S.W.2d 668, 677 (Tex. App.—Dallas 1992, writ denied) ("[A] breach [of contract] occurs when a party fails to perform a duty required by the contract."). However, a further investigation into pertinent Texas case law reveals that such a narrow construction of the elements of tortious interference with an existing contract is improper. Specifically, the Texas Supreme Court has provided that the termination of a "terminable-at-will" or "terminable upon notice" contract can be the basis of a proper tortious interference with an existing contract suit (despite the fact that such a contract was "terminated" instead of "breached"). *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 666 (Tex. 1990).

property records. [Finding of Fact No. 18]; [February 15, 2008 Tr. 156:14–22]. Royce Homes refused to comply with these requests. *Id*. This evidence establishes that Royce Homes was aware of the Bryants' contract to purchase Saratoga Springs from Decker Oaks.

Furthermore, Royce Homes' knowledge of Decker Oaks' contract with the Bryants prior to its termination is sufficient circumstantial evidence from which an intent to interfere can be inferred. As previously discussed, at the time the Demand Letter was sent, Royce Homes did not hold a reasonable belief that it maintained *any* interest in Saratoga Springs. *See* discussion *supra* Part IV(C)(iii). In view of this fact and Royce Homes' knowledge of the impending sale of Saratoga Springs, there is but a single logical conclusion explaining Royce Homes' refusal to remove the Memorandum of Contract—it was intended to frustrate the sale of Saratoga Springs to the Bryants. As such, Royce Homes' refusal to remove the Memorandum of Contract is properly categorized as an affirmative act intended to induce the Bryants to terminate their contract to purchase Saratoga Springs. Therefore, Decker Oaks has made the requisite showing to establish a willful and intentional act of interference with the contract, and this element of tortious interference with an existing contract is satisfied.

### 3. Proximate cause of the plaintiff's injury

"The classic proximate-cause tests for cause-in-fact and foreseeability apply to claims of tortious interference." *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). To satisfy this element, the plaintiff must set forth sufficient evidence to "support a reasonable probability that the defendant's acts or omissions were a substantial factor in bringing about injury." *Id*.

In the present dispute, Decker Oaks contracted with the Bryants for the sale of Saratoga Springs, and upon a title inspection, the Plaintiff's Memorandum of Contract was discovered.

[Royce Homes Ex. No. 29].  Decker Oaks requested that the filing be removed, but Royce Homes refused.  [February 15, 2008 Tr. 156:14–22].  As a result of this cloud on the title of Saratoga Springs, the Bryants terminated their contract to purchase.  [Decker Oaks Ex. No. 29].  Such evidence shows that the Memorandum of Contract was a primary or, at minimum, a substantial factor in defeating the contract.  Thus, this element of tortious interference is satisfied.

### 4.  Actual damages or loss

The damages element of tortious interference can be satisfied by injury attributable to a lost sale.  *Cooper*, 318 S.W.2d at 757.  As previously discussed, Decker Oaks was unable to sell Saratoga Springs as a result of Royce Homes' filing of and refusal to remove the Memorandum of Contract.  *See* discussion *supra* Part IV(D)(iii).  The loss of this sale precluded Decker Oaks from realizing a $750,000.00 profit and satisfying all liens on Saratoga Springs.  [February 15, 2008 Tr. 153:1–24].  As such, Decker Oaks is able to show actual damage or loss, and has satisfied the fourth element of tortious interference with an existing contract.

In summation, Decker Oaks has established a cause of action for tortious interference with an existing contract because it has satisfied each of the necessary elements of the tort.

### E.  Tortious Interference with a Prospective Contract

Decker Oaks asserts that Royce Homes tortiously interfered with Decker Oaks' potential contracts for the sale of Saratoga Springs.  Specifically, Decker Oaks asserts that Royce Homes' filing of, and refusal to remove, the Memorandum of Contract constituted tortious interference.  The Court disagrees.

Texas law offers protection to prospective contracts as well as existing contracts.  *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc.*, 200 F.3d 307, 316 (5th Cir.

2000); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989). The elements of tortious

interference with a prospective contract are:

> (1) a reasonable probability that the plaintiff and a third party would have entered
> into a contractual relationship; (2) that an independently tortious or wrongful act
> by the defendant prevented the relationship from occurring; (3) that the defendant
> did the act with a conscious desire to prevent the relationship from occurring or
> knew that the interference was certain or substantially certain to occur as a result
> of the conduct; and (4) that the plaintiff incurred actual harm or damage as a
> result of the defendant's interference.

*Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 632 (Tex. App.—Fort Worth 2007,

pet. denied) (footnotes omitted); *Johnson v. Baylor Univ.*, 188 S.W.3d 296, 304 (Tex. App.—

Waco 2006, pet. denied); *Gaia Techs. Inc. v. Recycled Prods. Corp.*, 175 F.3d 365, 377 (5th Cir.

1999) (applying Texas law). In the dispute at bar, Decker Oaks is unable to establish a cause of

action for tortious interference with a prospective contract because it is unable to show a

reasonable probability that it would have entered into a contractual relationship to sell Saratoga

Springs or that it sustained damages as a result of Royce Homes' interference.

### 1. A reasonable probability that the plaintiff and a third party would have entered into a contractual relationship

A valid suit for tortious interference with a prospective contract need not establish a

certainty that a contract would have been formed but for the interference; a reasonable

probability, upon consideration of all pertinent facts and circumstances, is all that need be

shown. *Richardson-Eagle, Inc.*, 213 S.W.3d at 476. Decker Oaks is unable to satisfy this

element of tortious interference with a prospective contract.

Decker Oaks presented evidence that in January of 2006, it began attempts to sell

Saratoga Springs. [Finding of Fact No. 13]; [February 15, 2008 Tr. 141:16–25]. Weedn testified

that, after putting up a sign stating that the property was for sale, he was contacted by over

twenty potential purchasers. [Finding of Fact No. 13]; [February 15, 2008 Tr. 142:3–11].

However, Decker Oaks presented no further evidence regarding would-be purchasers other than the Bryants. By example, Decker Oaks failed to present specific evidence of any interested parties, such as the identities of potential buyers, the occurrence of preliminary contract negotiations, or the existence of correspondence regarding the property. As such, Decker Oaks has failed to demonstrate a reasonable probability that it would have entered into a contract for the sale of Saratoga Springs, and therefore, this element of tortious interference with a prospective contract is not satisfied.[27]

### 2. An independently tortious or wrongful act by the defendant prevented the relationship from occurring

To satisfy the "independently tortious" requirement, the complained of acts must be "conduct that would violate some other recognized tort duty." *Baylor Univ.*, 188 S.W.3d at 304; *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 635 (5th Cir. 2002) (applying Texas law). As discussed above, Royce Homes committed slander of title by recording the Memorandum of Contract. *See* discussion *supra* Part IV(C). Thus, the asserted interference with a prospective contract—filing and refusing to remove the Memorandum of Contract—breached a recognized tort duty, and as such, this element of tortious interference with a prospective contract is satisfied.

### 3. The defendant did the act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of the conduct

The intent to interfere may be proven by circumstantial evidence. *Yeager v. TRW, Inc.*, 984 F. Supp. 517, 523 (E.D. Tex. 1997) (applying Texas law); *Spoljaric v. Percival Tours, Inc.*,

---

[27] The Court notes that Decker Oaks has provided specific evidence pertaining to its correspondence with the Bryants. As this correspondence produced a contract, that issue has properly been addressed in this Opinion under the heading of Tortious Interference with an Existing Contract. *See* discussion *supra* Part IV(D). Further, Decker Oaks produced no evidence pertaining to its relationship with the Bryants after the termination of their contract. As such, it cannot maintain a cause of action arising from any tortious interference with its relationship with the Bryants arising after the termination of their initial contract.

708 S.W.2d 432, 435 (Tex. 1986); *Garcia v. C.F. Jordan, Inc.*, 881 S.W.2d 155, 158 (Tex. App.—El Paso 1994, no writ).   In the suit at bar, when the Memorandum of Contract was filed, Royce Homes did not harbor a reasonable belief that it held any property interest in Saratoga Springs. *See* discussion *supra* Part IV(D)(ii).  Absent such a belief, the Court sees no reason that a sophisticated business entity—such as Royce Homes—would file the Memorandum of Contract, except to preclude the sale of Saratoga Springs.[28]  As such, the conclusion that Royce Homes acted with the conscious desire to prevent Decker Oaks from contracting to sell Saratoga Springs necessarily follows.   Thus, this element of tortious interference with a prospective contract relation is satisfied.

### 4. The plaintiff incurred actual harm or damage as a result of the defendant's interference.

Decker Oaks is unable to satisfy this element of tortious interference with a prospective contract because it has failed to display a reasonable probability that it would have entered into a contract for the sale of Saratoga Springs but for Royce Homes' interference.  *See* discussion *supra* Part IV(E)(i).  If Decker Oaks is unable to make such a showing, it necessarily follows that it cannot prove that damages arose as a result of Royce Homes' interference.  Thus, Decker Oaks is unable to satisfy this element of tortious interference with a prospective contract.

In summation, Decker Oaks is unable to satisfy two of the four elements of tortious interference with a prospective contract.  Specifically, Decker Oaks has not shown a reasonable probability that it would have entered into a contractual relationship to sell Saratoga Springs or

---

[28] In the alternative, a sophisticated builder such as Royce Homes would recognize that filing the Memorandum of Contract would necessarily preclude the sale of Saratoga Springs because the Memorandum of Contract would be a cloud on the property's title.  Thus, filing the Memorandum of Contract also satisfies this element of tortious interference with a prospective contract because Royce Homes necessarily recognized that an interference was certain, or substantially certain, to occur as a result of its conduct.

that it sustained damages as a result of Royce Homes' interference.  As such, Decker Oaks is

unable to establish a cause of action for tortious interference with a prospective contract.

### F.  Common Law Fraud

Decker Oaks asserts that Royce Homes knowingly and intentionally made false

representations in the Memorandum of Contract that render it liable for common law fraud.  The

Court disagrees.

"The gist of fraud is successfully using cunning, deception or artifice to cheat another to

the other's injury."  *McEwin v. Allstate Tex. Lloyds*, 118 S.W.3d 811, 816 (Tex. App.—Amarillo

2003, no pet.).  While fraud is a multiform tort, the traditional elements are: (1) the defendant

made a material misrepresentation; (2) when the defendant made the representation, the

defendant knew the representation was false, or made the representation recklessly, without

knowledge of its truth; (3) the plaintiff relied on the representation to their detriment; and (4) the

defendant made the representation with the intent that the plaintiff act on it.  *United Teacher*

*Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 566 (5th Cir. 2005) (applying Texas

law); *Power Res. Group, Inc. v. Pub. Utility Com'n of Tex.*, 73 S.W.3d 354, 362 (Tex. App.—

Austin 2002, pet. denied); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983); *McEwin*, 118

S.W.3d at 816.  Decker Oaks cannot show that Royce Homes made a representation with the

intent that Decker Oaks act on it, nor can Decker Oaks show detrimental reliance on such a

representation.  Therefore, Decker Oaks cannot establish a suit for common law fraud.

### 1.  A material misrepresentation was made.

For the purposes of fraud, "[a]n actionable representation is one concerning a material

fact."  *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995); *In re Westcap Enters.*,

230 F.3d 717, 726 (5th Cir. 2000) (applying Texas law).  Such a representation is material if a

reasonable person's conduct would likely be affected with regards to the transaction in question. *In re Johnson*, 1993 WL 503410, at *3 (5th Cir. Nov. 22, 1993) (unpublished opinion) (applying Texas law); *Coldwell Banker Whiteside Assocs. v. Ryan Equity Partners, Ltd.*, 181 S.W.3d 879, 888 (Tex. App.—Dallas 2006, no pet.). Further, the misrepresentation must have been false at the time it was made. *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004) (applying Texas law); *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 613 (Tex. App.—Waco 2000, pet. denied).

Royce Homes' Memorandum of Contract stated that "[Royce Homes had a] right to acquire the [Saratoga Springs property] pursuant to the terms of a Contract of Sale by and between [Royce Homes and Decker Oaks] dated effective November 16, 2001." [Decker Oaks Ex. No. 5]. Such a statement sets forth an assertion of fact. Further, as previously discussed, Royce Homes did not have a right to purchase Saratoga Springs when it initially filed the Memorandum of Contract in 2004, nor at any point thereafter. *See* discussion *supra* Part IV(B). As such, the representation of fact was false.

Furthermore, the misrepresentation in the Memorandum of Contract was material. A reasonable party's conduct could, with regard to a realty transaction, be affected by a factual assertion contained in the property records. In fact, the Bryants' conduct in regards to their potential purchase of Saratoga Springs was so affected that they chose not to consummate the purchase after discovering the Memorandum of Contract. *See* discussion *supra* Part IV(D)(iii). Thus, as the assertion contained in the Memorandum of Contract was a material misrepresentation, this element of common law fraud is satisfied.

**2. The plaintiff relied on the representation to its detriment.**

A plaintiff establishes reliance by showing that the defendant's acts and representations induced it to either act or refrain from acting, to its detriment. *Pasture Renovators, L.L.C. v. Lawson Cattle & Equip., Inc.*, 480 F. Supp. 2d 890, 893–894 (W.D. Tex. 2006) (applying Texas law); *Prospect High Income Fund v. Grant Thornton, LLP*, 203 S.W.3d 602, 618 (Tex. App.— Dallas 2006, pet. denied) (citing *TCA Bldg. Co. v. Entech, Inc.*, 86 S.W.3d 667, 674 (Tex. App.—Austin 2002, no pet.)). Decker Oaks is unable to establish the requisite reliance to satisfy this element of fraud.

Specifically, Decker Oaks has failed to show, and this Court fails to see, how it relied on Royce Homes' representations in the Memorandum of Contract. Decker Oaks asserted that "a potential *buyer* of the Property [relied] on the false representation contained in the Memorandum of Contract." [Docket No. 17] (emphasis added). Reliance by a potential buyer does not satisfy the requirement that Decker Oaks relied on Royce Homes' representation. In addition to its failure to show reliance, Decker Oaks has not shown in what manner it relied on Royce Homes' representation *to its detriment*. As such, Decker Oaks has failed to satisfy this element of common law fraud.

### 3. The defendant made the representation with the intent that the plaintiff act on it.

As discussed above, the Court fails to see any manner in which Decker Oaks could have relied on Royce Homes' representations in the Memorandum of Contract. Likewise, the Court does not see, nor does Decker Oaks point out, specific actions that Royce Homes would have intended to induce Decker Oaks to take as a result of the filing of the Memorandum of Contract. As such, Decker Oaks has not established that Royce Homes made a representation with the intent that Decker Oaks act on it, and therefore, this element of fraud is not satisfied.

In summation, Decker Oaks is unable to satisfy at least two of the elements of common law fraud.  Specifically, Decker Oaks has failed to establish that it relied, to its detriment, on a material misrepresentation made by Royce Homes, or that such a misrepresentation was made with the intent that Decker Oaks act on it.  Therefore, Decker Oaks is unable to establish a cause of action for common law fraud.

### G. With respect to the Saratoga Springs contract, Royce Homes is entitled to the return of its $25,000.00 in earnest money.

As previously discussed, the Saratoga Springs contract failed for a want of mutual assent and for failure to comply with the Statute of Frauds.  *See* discussion *supra* Part IV(B).  As such, the terms contained therein—including any term potentially giving Decker Oaks a claim to the $25,000.00 in earnest money that Royce Homes deposited with Stewart Title pursuant to the failed contract—is unenforceable.  Therefore, Decker Oaks may not maintain any claim to Royce Homes' $25,000.00 in earnest money, and these funds should be released to Royce Homes.

### H. The Village of Decker Oaks Earnest Money

#### 1. Royce Homes was obligated to purchase eighty lots in the Village of Decker Oaks, Section I.

In the Decker Oaks contract, Royce Homes agreed to purchase 120 lots in the Village of Decker Oaks, Section I.  [Royce Homes Ex. No. 46].  This obligation was altered by the July Amendment, which stated, "[t]he 80 lots sold or available for sale in Section I are the complete obligation of the Seller and Purchaser for Section I and is satisfied."  [Royce Homes Ex. No. 56].  The parties at bar contest the meaning of this clause.  Royce Homes interprets the July Amendment to mean that all obligations relating to Section I are satisfied as of the execution of the amendment.  This interpretation relies on the phrase ". . . and is satisfied" to mean that the parties agreed that their responsibilities in the Village of Decker Oaks, Section I were complete

and no future action was required. In contrast, Decker Oaks asserts that the July Amendment was only satisfied if the parties consummated the sale of all eighty lots. [February 14, 2008 Tr. 67:3–8]; [February 15, 2008 Tr. 124:4–20].

When construing a contract, the primary concern of Texas courts is to determine and give effect to the contracting parties' intent as expressed on the face of the contract. *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006); *R & P Enter. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). To this end, a court must determine, as a matter of law, if a contract is ambiguous. *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 480 (5th Cir. 2008) (applying Texas law); *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam). An ambiguity does not exist simply because the parties advocate differing interpretations of the contract; for an ambiguity to exist, both interpretations must be reasonable. *Tex. Indus., Inc. v. Factory Mut. Ins. Co.*, 486 F.3d 844, 846 (5th Cir. 2007) (applying Texas law); *Colum. Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); *R & P Enter.*, 596 S.W.2d at 518. As such, the first step in determining whether the July Amendment is ambiguous is to evaluate whether each proposed interpretation is reasonable. This evaluation primarily centers around one phrase from the July Amendment: "80 lots sold or available for sale."

Initially, the Court looks to the obligations of the parties under the July Amendment. Under Royce Homes' interpretation of the amendment, the obligations of both parties were "satisfied" as of the execution of the July Amendment (regardless of the actual number of lots that changed hands). *See* [February 15, 2008 Tr. 14:14–15:8] (Kopecky asserting that Royce Homes purchased all of the lots it was obligated to purchase even though Kopecky could not state how many lots Royce Homes actually purchased). However, this interpretation is illogical

when viewed in context. Specifically, it seems far-fetched that two sophisticated parties would include the term "80 lots" in a contract if they did not intend to create an obligation to purchase eighty lots. The Court sees no reason that contracting parties would include a specific number of lots at all if they intended their obligations to be satisfied at the time of amendment regardless of how many lots were actually purchased. Furthermore, it is equally illogical that the contract would contain a term describing lots "available for sale" if there was no obligation to purchase or sell the lots that were then available.

Second, Royce Homes' interpretation of the July Amendment renders the phrase "80 lots sold or available for sale" devoid of any pertinent meaning. Such an interpretation is improper. *See Curlett Family Ltd. P'ship, Ltd. v. Particle Drilling Techs., Inc.*, 254 Fed. Appx. 320, 325 (5th Cir. 2007) (unpublished opinion) (applying Texas law); *Blaylock v. Am. Guarantee Bank Liab. Ins. Co.*, 632 S.W.2d 719, 722 (Tex. 1982) ("A contract will not be construed so as to render some of its terms meaningless."). This absence of meaning under Royce Homes' contractual interpretation is obvious if one replaces the phrase "80 lots sold or available for sale" with arbitrary language. For example, under Royce Homes' interpretation of the July Amendment, were the arbitrary phrase "111 lots sold or painted green" to be substituted for "80 lots sold or available for sale," the contract remains functionally the same—the parties' obligations would still be fully satisfied as of the amendment's execution (regardless of whether 2 or 200 lots changed hands). Thus, the Court finds that Royce Homes' interpretation is unreasonable.

In contrast, Decker Oaks' interpretation of the July Amendment appears reasonable. Decker Oaks interprets the contract to impose an obligation on both parties to sell/purchase eighty lots that were either purchased prior to the amendment or were available for sale at the

time of amendment.  Moreover, this interpretation gives reasonable meaning to the phrase "80 lots sold or available for sale."  Specifically, under Decker Oaks' interpretation, if a party failed to consummate the sale of the eighty lots, that party breached the contract.  Lastly, it is equally reasonable that the parties included the ". . . and is satisfied" language to express that the purchase of all eighty lots constituted satisfaction of all of the obligations of both parties in the Village of Decker Oaks, Section I (as opposed to the 120 lots agreed to in the original contract).

As such, Decker Oaks' construction is the only reasonable interpretation of the July Amendment, and since a contract is only ambiguous if it is subject to multiple reasonable interpretations, the July Amendment is not ambiguous.  Therefore, the Court finds that, as a matter of law, the July Amendment would be satisfied only by the sale of eighty lots.[29]

### 2. Royce Homes materially breached the Decker Oaks contract by failing to purchase the required eighty lots.

Under Texas law, a contract is breached when a party fails or refuses to comply with a contractual obligation. *Decorative Ctr. of Houston, L.P. v. Direct Response Publ'ns, Inc.*, 264 F. Supp. 2d 535, 547 (S.D. Tex. 2003); *Townewest Homeowners Ass'n, Inc. v. Warner Commc'n Inc.*, 826 S.W.2d 638, 640 (Tex. App.—Houston [14th Dist.] 1992, no writ).  Whether a party's actions constitute a breach of contract is a question of law.  *Craft v. John H. Harland Co.*, 2007 WL 2325590, at *4 (N.D. Tex. Aug. 14, 2007) (applying Texas law); *Meek v. Bishop, Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied).  Royce Homes did not purchase eighty lots in the Village of Decker Oaks, Section I as required by the July Amendment, and therefore breached the contract.  To determine whether this breach

---

[29] In the alternative, even if the contract were, as a matter of law, ambiguous, the Court finds, based upon a consideration of the factors set forth in the prior analysis, that, as a matter of fact, the Villages of Decker Oaks contract provides that Royce Homes was obligated to purchase eighty lots in the Village of Decker Oaks, Section I. *See Fujimoto v. Rio Grande Pickle Co.*, 414 F.2d 648, 654 (5th Cir. 1969); *McKnight v. Trogdon-McKnight*, 132 S.W.3d 126, 131 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("When a contract contains an ambiguity, its interpretation is a question of fact.") (citing *Zeolla v. Zeolla*, 15 S.W.3d 239, 242 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

of contract is material under Texas law, the Court must apply a list of considerations set forth in the Restatement of Contracts. *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994); *Fedgess Shopping Ctrs., Ltd. v. MNC SSP, Inc.*, 2007 WL 4387337, at *3 (Tex. App.— Houston [14 Dist.] 2007, no pet. h.) (unpublished opinion). The factors to be considered include:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981); *Underwriters Group, Inc. v. Clear Creek Indep. School Dist.*, 2008 WL 112104, at *4 (S.D. Tex. Jan. 9, 2008) (applying Texas law); *Hernandez*, 875 S.W.2d at 693. Whether a breach of contract is *material* is a question of fact. *Chesson v. Hall*, 2007 WL 1964538, at *17 (S.D. Tex. July 3, 2007) (applying Texas law); *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004).

### a. The extent to which the injured party will be deprived of the benefit which it reasonably expected.

This factor favors a finding that Royce Homes' breach was material. Decker Oaks expected income of approximately $160,000.00 from the sale of the last nine lots in the Village of Decker Oaks, Section I. [February 22, 2008 Tr. 125:10–17]. The parties had contracted for this sale, and as such, Decker Oaks reasonably expected this benefit. Thus, when Royce Homes failed to purchase the remaining nine lots under the July Amendment, Decker Oaks was deprived of a benefit that it reasonably expected.

**b. The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived.**

This factor favors a finding that Royce Homes' failure to purchase the remaining lots under the Decker Oaks contract was a material breach. *See* RESTATEMENT (SECOND) OF CONTRACTS § 241 cmt. c (1981) ("If the failure is a [material] breach, the injured party always has a claim for damages...."). Decker Oaks' capability to specifically state the damages it sustained as a result of Royce Homes' breach shows that financial recompense can adequately compensate Decker Oaks.

**c. The extent to which the party failing to perform or to offer to perform will suffer forfeiture.**

A party's failure under a contract is less likely to be deemed material if the breaching party is likely to suffer a forfeiture. RESTATEMENT (SECOND) OF CONTRACTS § 241 cmt. d. A finding of material breach will not impose a significant forfeiture on Royce Homes, as it has not expended substantial funds on this contract without receiving consideration in return. Royce Homes' sole significant expense associated with this contract was the cost of the lots. It received realty in exchange for these costs, and as such, no significant forfeiture is likely to befall Royce Homes if its breach is deemed material. Thus, this consideration weighs in favor of a finding of materiality.

**d. The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances.**

This factor favors a finding that Royce Homes' failure to satisfy its obligations under the Decker Oaks contract was a material breach. Royce Homes asserts that, near the time of the breach, it was attempting to purchase all lots available to it in the Village of Decker Oaks. [February 15, 2008 Tr. 123:2–7]. If true, such an assertion would favor a finding that Royce

Homes' breach was not material. However, Decker Oaks, in its letter of September 3, 2004, made Royce Homes aware of its failure, and Royce Homes did not attempt to cure its breach at that time. *See* [Royce Homes Ex. No. 72]. Thus, this factor supports a finding of a material breach.

### e. The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Consideration of this factor weighs in favor of a finding of a non-material breach. The record indicates that, at the time of the breach, Royce Homes' failure to purchase its required lots in the Village of Decker Oaks, Section I was unknowing. [February 15, 2008 Tr. 14:14–15:14]. Further, Decker Oaks did not immediately make Royce Homes aware of its failure such that it could cure the problem. [February 15, 2008 Tr. 126:3–5]. Thus, this factor weighs against a finding of a material breach.

In summation, four of the five factors weigh in favor of a finding that Royce Homes' failure to meet its obligations under the Decker Oaks contract was a material breach. As such, this Court finds that Royce Homes materially breached the Decker Oaks contract.

### 3. Decker Oaks was excused from performance under the Decker Oaks contract after Royce Homes' material breach.

"[W]hen one party to a contract commits a material breach of [a] contract, the other party is discharged or excused from any obligation to perform." *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *Int'l Ins. Co. v. RSR Corp.*, 148 Fed. Appx. 226, 230 (5th Cir. 2005) (unpublished opinion) (applying Texas law). Thus, Decker Oaks was excused from further performance under the Decker Oaks contract if Royce Homes first materially breached the contract. Royce Homes committed a material breach by failing to purchase the required eighty lots under the Decker Oaks contract. *See* discussion *supra* Part IV(H)(ii). As such,

Decker Oaks was excused from further performance under the Decker Oaks contract after Royce

Homes failed to purchase eighty lots pursuant to the contract.

### 4. The $62,000.00 in earnest money secured performance of the entire Decker Oaks contract.

As previously discussed, when evaluating contractual language, a court must determine,

as a matter of law, if a contract is ambiguous. *Amigo Broad.,* 521 at 480 (applying Texas law);

*Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam); *see*

discussion *supra* Part IV(H)(ii). Contractual ambiguity is present only if multiple reasonable

interpretations are proffered. *Valley Reg'l Med. Ctr. v. Wright*, 276 F. Supp. 2d 620, 627 (S.D.

Tex. 2001) (applying Texas law); *Colum. Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940

S.W.2d 587, 589 (Tex. 1996). As such, the initial step in establishing whether the Decker Oaks

contract is ambiguous with regards to earnest money is to determine whether each proposed

interpretation is reasonable.

Royce Homes argues that the $62,000.00 in earnest money, provided for in the July

Amendment, solely secures the purchase of sixty lots in the Village of Decker Oaks, Section II.

The Court disagrees. This interpretation of the Decker Oaks contract would leave no earnest

money allocated to secure the purchase of lots in the Village of Decker Oaks, Section I.

However, the Decker Oaks contract provides that Decker Oaks' "*sole and exclusive remedy* [is]

the right to terminate this Contract and retain the Earnest Money then on deposit." [Royce

Homes Ex. No. 47, § 3.01(c)] (emphasis added). Thus, it appears that Royce Homes' contractual

interpretation would leave Decker Oaks a single remedy should Royce Homes breach its

obligations in the Village of Decker Oaks, Section I—the right to retain $0.00 in earnest money

allocated to the Village of Decker Oaks, Section I. A reasonable businessperson would not agree

to a contract under which he or she had essentially no remedy for a breach. As such, Royce

Homes' proffered contract interpretation is not reasonable; therefore, the contract is not, as a matter of law, ambiguous.

Further, interpreting the Decker Oaks contract in accordance with its plain language establishes Royce Homes' interpretation to be unreasonable.    *See Schneider Nat. Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) (applying Texas law); *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 133 (Tex. App.—El Paso 1997, pet. denied) ("[A] contract is to be interpreted in accordance with its plain language.").  The July Amendment provides that "the earnest money is hereby amended" to $62,000.00.  Webster's Dictionary defines "amend" to mean, in pertinent part, "to alter formally by modification . . . ."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 37 (10th ed. 1993).  Thus, a plain language interpretation of the July Amendment establishes that the earnest money has been modified to $62,000.00.  As such, it would appear that no substantive terms, other than the amount of earnest money, have been amended.  Therefore, since the Decker Oaks amendment does not provide for a particular allocation of earnest money, and the July Amendment does not make any such change, it seems illogical to read any other meaning into the contract.  This Court refuses to create contractual terms that are simply not present.  As such, Royce Homes' interpretation is unreasonable, and therefore, the contract is not ambiguous.

Based upon these considerations, the Court finds that the Decker Oaks contract is not, as a matter of law, ambiguous.  Therefore, Decker Oaks' interpretation that the $62,000.00 earnest money deposited with Stewart Title secures each of Royce Homes' obligations under the Decker Oaks contract is adopted.[30]

---

[30]  In the alternative, even if the contract were, as a matter of law, ambiguous, the Court finds, based upon a consideration of the factors set forth in the prior analysis, that, as a matter of fact, the Villages of Decker Oaks contract provides that all obligations under the contract are secured by the $62,000.00 earnest money.  *See McKnight v. Trogdon-McKnight*, 132 S.W.3d 126, 131 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("When a contract

### 5. Decker Oaks provided sufficient notice of its intent to terminate the Decker Oaks contract.

Under the Decker Oaks contract, if Royce Homes failed to consummate a required closing, Decker Oaks had the right to terminate the contract. [Royce Homes Ex. No. 46, § 5.01]. Further, the contract provides that "Each Party shall be entitled to written notice of any default . . . ." *Id.* § VII. Apparently relying on these provisions, Royce Homes asserts that Decker Oaks' September 16, 2004 letter terminating the Decker Oaks contract was insufficient to terminate the contract because it incorrectly stated that Royce Homes had defaulted under the contract by failing to deposit the required earnest money. [Royce Homes Ex. No. 73]; *see* [Finding of Fact No. 11]; [February 22, 2008 Tr. 71:14–19]. Further, Royce Homes argues that Decker Oaks' September 3, 2004 letter—correctly asserting that Royce Homes was in default for a failure to purchase its allotment of lots—was insufficient to correct this problem. *See* [Royce Homes Ex. No. 72]; [Finding of Fact No. 10]. These assertions are misplaced because Decker Oaks has complied with its obligations under the Decker Oaks contract and properly exercised its right to terminate the contract. A plain language evaluation of the pertinent documents supports this conclusion.

Pursuant to the Decker Oaks contract, Decker Oaks was obligated to give "written notice of any default." [Royce Homes Ex. No. 46 at § VII]. Decker Oaks complied with this obligation in its letter of September 3, 2004, in which its legal counsel stated, "...we have been requested to give notice to Royce Homes, L.P. that it is in default under the [Decker Oaks contract] . . . ." [Royce Homes Ex. No. 72]. Further, the September 3, 2004 letter provides, "Royce contracted

---

contains an ambiguity, its interpretation is a question of fact.") (citing *Zeolla v. Zeolla*, 15 S.W.3d 239, 242 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

for 81 lots in Villages Section.  It has taken 72 lots, and has 9 lots to take under the contract."[31] *Id*.  As such, this letter was sufficient to give Royce Homes notice of both the fact that a default had occurred and the nature of the default.  This Court finds that Decker Oaks' notice obligations under the Decker Oaks contract were satisfied.

The Decker Oaks contract further states that "[i]n the event that Seller shall fulfill all of Seller's obligations pursuant to this Contract and, should Purchaser breach any term of this Contract, Seller shall be entitled, as Seller's sole and exclusive remedy, to … terminate this Contract . . . ."  [Royce Homes Ex. No. 46 at § 5.01].  The plain language of this clause provides one condition that must be satisfied prior to Decker Oaks' termination of the contract— a breach of a contractual term by Royce Homes.  As previously discussed, this condition was satisfied by Royce Homes' failure to purchase all eighty lots pursuant to the contract.  *See* discussion *supra* Part IV(H)(ii).  Thus, although Decker Oaks' letter of September 16, 2004 incorrectly asserted that Royce Homes had not deposited its required earnest money, the termination was still proper because the condition necessary to termination, as clearly set forth in the Decker Oaks contract, had been satisfied.

In summation, Decker Oaks complied with its contractual obligations regarding notice of default, and only exercised its right to terminate the contract after the necessary conditions had been satisfied.  Thus, while Decker Oaks did make improper factual assertions in its letter of September 16, 2006, it complied with the Decker Oaks contract, and as such, its termination was proper.

---

[31] The record is unclear as to whether the number of lots that Royce Homes purchased was seventy-one lots or seventy-two lots; it was either one or the other.  Accordingly, there are some references in this Opinion to seventy-one lots and some references to seventy-two lots.  There is no question that Royce Homes did not purchase all eighty lots pursuant to the July Amendment.  Moreover, the letter references an obligation to purchase eighty-one lots. [Royce Homes Ex. No. 72].  However, the July Amendment expressly referred to eighty lots, and there is no controversy that the number was eighty.  The Court therefore concludes that the attorney for Decker Oaks who drafted the letter made a typographical error and erroneously referred to eighty-one lots when he meant to refer to eighty lots.

### 6. Decker Oaks' failure to send notice of termination to Speer is not a material breach.

The Decker Oaks contract provides that any notice required under the contract must be sent to, among others, Royce Homes with a copy to Speer. Decker Oaks failed to send a copy of its September 16, 2004 notice of termination to Speer, and therefore, breached this contractual obligation. [Royce Homes Ex. No. 73]. As previously discussed, whether a breach is material is determined based on a consideration of the following factors:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981); *Underwriters Group, Inc. v. Clear Creek Indep. School Dist.*, 2008 WL 112104, at *4 (S.D. Tex. Jan. 09, 2008) (applying Texas law); *Hernandez*, 875 S.W.2d at 693. Whether a breach of contract is *material* is a question of fact. *Chesson v. Hall*, 2007 WL 1964538, at *17 (S.D. Tex. July 03, 2007) (applying Texas law); *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004).

### a. The extent to which the injured party will be deprived of the benefit which it reasonably expected.

Royce Homes reasonably expected that a copy of all notices under the Decker Oaks contract would be sent to Speer because the Decker Oaks contract specifically provided for such. [Royce Homes Ex. No. 47, § XVI]. However, Royce Homes did not assert that it failed to receive Decker Oaks' correspondence, but only that a copy was not sent to Speer. *See* [Royce

Homes Ex. No. 73] (the correspondence was sent to Weber, not Speer). The Court sees no actual benefit, nor has Royce Homes shown any benefit beyond mere technical compliance, that Royce Homes was deprived of due to Speer not receiving a copy of the September 16, 2004 letter. As such, while Royce Homes reasonably that expected a copy of any notice would be sent to Speer, it was not deprived of any actual benefit, and therefore, this factor weighs in favor of a finding of immateriality.

**b. The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived.**

As discussed above, the Court sees no benefit that was denied Royce Homes except for technical compliance. As such, Royce Homes need not be compensated for Decker Oaks' failure under the Decker Oaks contract. Thus, this element favors a finding of an immaterial breach.

**c. The extent to which the party failing to perform or to offer to perform will suffer forfeiture.**

Consideration of this factor weighs in favor of a finding of materiality. A party's failure under a contract is less likely to be deemed material if the breaching party is likely to suffer a forfeiture. RESTATEMENT § 241 cmt. d. Decker Oaks is unlikely to suffer a significant forfeiture as a result of a finding of material breach. As discussed previously, both parties to the Decker Oaks contract received consideration in exchange for the consideration they provided (either real property or money). *See* discussion *supra* Part IV(H)(ii)(3). As such, Decker Oaks is unlikely to suffer significant forfeiture as a result of a finding of materiality.

**d. The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances.**

There is no evidence that Decker Oaks was ever aware of its failure to give notice to Speer prior to litigation. As such, Decker Oaks never was afforded an opportunity to fix its

breach. However, such a lack of opportunity does not completely forgive the fact that Decker Oaks never cured its breach. Under such considerations, the Court finds that this factor slightly weighs in favor of a finding of immateriality.

> **e. The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.**

Royce Homes did not assert that any bad faith was present in Decker Oaks' failure to send a copy of the September 16, 2004 letter to Speer. Moreover, no evidence was ever proffered to show that Decker Oaks was aware of its breach such that it could take remedial actions. Therefore, consideration of this factor weighs in favor of a finding of a non-material breach.

In summation, four of the five factors weigh in favor of a finding that Decker Oaks' failure to send a copy of its September 16, 2004 letter to Speer was an immaterial breach. Based upon such considerations, this Court finds that, as a matter of fact, Royce Homes did not materially breach the Decker Oaks contract.[32]

> **7. Decker Oaks is entitled to Royce Homes' $62,000.00 earnest money pursuant to the Decker Oaks Contract.**

The Decker Oaks contract provides that "[i]n the event that Seller shall fulfill all of Seller's obligations pursuant to this Contract and, should Purchaser breach any term of this Contract, Seller shall be entitled, as Seller's sole and exclusive remedy, to … retain or receive the Earnest Money then on deposit as liquidated damages." [Royce Homes Ex. No. 46, § 5.01]. Royce Homes committed a material breach by failing to purchase eighty lots under the Decker Oaks contract. *See* discussion *supra* Part IV(H)(ii). Due to Royce Homes' material breach,

---

[32] The Court notes that in the face of an immaterial breach, the non-breaching party is able to seek damages arising from that breach. *S. Steel Co. v. Consol. Eng'g Co.*, 677 S.W.2d 97, 103 (Tex. App.—San Antonio 1984), *rev'd on other grounds,* 699 S.W.2d 188 (Tex. 1985). However, Royce Homes has not alleged or presented evidence of harm arising from Royce Homes' breach, and as such, this Court will not address damages associated with this breach.

Decker Oaks was excused from further performing under the Decker Oaks contract. *See* discussion *supra* Part IV(H)(iii). Further, Royce Homes has not established that Decker Oaks did not fulfill its obligations prior to Royce Homes' breach. Indeed, Decker Oaks has established that it has fulfilled all of its obligations under the Decker Oaks contract and Royce Homes breached one of its obligations. Therefore, pursuant to the Decker Oaks contract, Decker Oaks is entitled to receive the $62,000.00 in earnest money that was deposited with Stewart Title by Royce Homes.

## V.      Damages

### A. **Slander of Title**

At trial, Decker Oaks introduced testimony on the damages that it has incurred as a result of Royce Homes' filing of and refusal to withdraw the Memorandum of Contract.[33] Based upon the research that this Court has done and this Court's finding that Royce Homes is liable under the slander of title theory, the Court is of the view that the measure of damages is the value of the contract with the Bryants less the fair market value of Saratoga Springs at the time of trial. *Duncan Land & Exploration, Inc. v. Littlepage*, 984 S.W.2d 318, 333 (Tex. App.—Fort Worth 1998, pet. denied) ("A plaintiff may recover the amount he would have realized from the sale less the amount for which he could have sold the lease at the time of the trial with the cloud removed."); *Reaugh v. McCollum Exploration Co.*, 139 Tex. 485, 163 S.W.2d 620, 622 (1942); *Williams v. Jennings*, 755 S.W.2d 874, 879 (Tex. App.—Houston [14th Dist.] 1988, writ denied). Unfortunately, because foreclosure occurred on Saratoga Springs well in advance of trial, there is no way of demonstrating what the value of Saratoga Springs was at the time of trial.

---

[33] The Court notes that in their First Amended Answer and Counter-Claims, the entity known as Decker Oaks Development II, Ltd. and Robert Weedn, individually, defined themselves collectively as "Decker Oaks." Hence, this Court construed the Counter-Claims to be brought on behalf of both of these defendants. However, as only the partnership entity was a party to the Decker Oaks contract and Saratoga Springs contract, Decker Oaks Development II, Ltd. is entitled to recover on the Counter-Claims, while Robert Weedn, individually, is not.

This problem, however, should not preclude Decker Oaks from recovering damages from Royce Homes.  In its counterclaim, Decker Oaks pleaded for various relief, including "such other and further relief, either at law or in equity, to which Defendants are justly entitled." [Docket No. 17, § VI]. This Court is a court of equity, and equity dictates that Royce Homes should not escape paying damages simply because Decker Oaks is unable to prove the value of Saratoga Springs at the time of trial. *Young v. U.S.*, 535 U.S. 43, 50 (2002).  This is particularly so when it was the misconduct of Royce Homes that led to the foreclosure on Saratoga Springs. Case law is clear that when damages cannot be proven due to events beyond the prevailing party's control, a court of equity is empowered to develop a fair formula for measuring damages. *Freeman v. Pitts*, 503 U.S. 467, 487 (1992).  ("The essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to . . . redress the injuries caused by unlawful action. Equitable remedies must be flexible if these underlying principles are to be enforced with fairness and precision.").  Here, the Court finds that it is equitable to measure damages by determining the difference between the value of the contract with the Bryants and the value of Saratoga Springs on or near the date of foreclosure.[34]

In the dispute at bar, there is sufficient evidence for establishing the value of the contract that Decker Oaks had with the Bryants.  However, the record is devoid of evidence pertaining to the value of Saratoga Springs on the date of foreclosure.  Therefore, this Court will hold a subsequent hearing to allow the parties to introduce testimony on this sole issue.

### B. Tortious Interference with an Existing Contract

---

[34] The Supreme Court of Texas stated in dicta that—pursuant to the rule set forth in the Restatement of Torts—damages for slander of title should be "the difference between the price which would have been realized [had the defeated sale been consummated] and the salable value of the thing in question after there has been a sufficient time following the frustration of the sale to permit its marketing." *Reaugh*, 163 S.W.2d 620, 622 (citing RESTATEMENT (FIRST) OF TORTS § 633 (1938)).  The Supreme Court of Texas noted this rule with approval, though it did not adopt it.  *Id.*  This Court finds that the time frame between the attempted sale to the Bryants and the foreclosure was sufficient to permit the re-marketing of Saratoga Springs.  As such, this Court will apply the Restatement's rule to fashion an equitable remedy for the suit at bar.

The "'aim of awarding damages for tortious interference,' . . . is 'to place the injured party in the same economic position it would have been in had the contract not been breached.'" *Sulzer Carbomedics, Inc. v. Or. Cardio-Devices, Inc.*, 257 F.3d 449, 456 (5th Cir. 2001) (citing *Marcus, Stowell & Beye Gov't Sec., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 231 (5th Cir.1986)) (applying Texas law). As such, "[t]he usual measure of damages for tortious interference is the same as for breach of contract."[35] *In re Performance Nutrition, Inc.*, 239 B.R. 93, 115 (Bankr. N.D. Tex. 1999) (citing *Armendariz v. Mora*, 553 S.W.2d 400, 406 (Tex. Civ. App.—El Paso 1977, writ ref'd n.r.e.)) (applying Texas law). Proper redress for a breach of contract is a "money judgment for actual damages." *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1070 (5th Cir. 1984) (quoting *Graham v. Turner*, 472 S.W.2d 831, 838 (Tex. Civ. App.—Waco 1971, no writ)). Such actual damages are properly categorized as either general damages or special damages. *Cont'l Holdings, Ltd. v. Leahy*, 132 S.W.3d 471, 475 (Tex. App.—Eastland 2003, no pet.). "Profits lost on the breached contract itself, such as the amount that [the non-breaching party] would have received on the contract less its saved expenses, are classified as [general] damages. Profits lost on other contracts or relationships resulting from the breach are classified as [consequential] damages." *Id.*

At trial, Decker Oaks failed to establish any general damages arising from Royce Homes' interference with the Bryants' contract to purchase Saratoga Springs. Specifically, Decker Oaks did not introduce any evidence regarding the fair market value of Saratoga Springs at the time of breach. Thus, Decker Oaks has failed to establish the amount it "would have received on the

---

[35] In addition to traditional damages, tortious interference with an existing contract can lead to liability for consequential losses, emotional distress, actual harm to reputation, and lost profits. *Performance Nutrition*, 239 B.R. at 115.

contract less its saved expenses," and therefore, failed to establish any general damages. As such, the Court next looks to whether any consequential damages are present.[36]

"[Consequential] damages are those that proximately result from the defendant's wrongful conduct but are of such an unusual nature that they would normally vary with the circumstances of the individual case in which they occur." *Burke v. Union Pac. Res. Co.*, 138 S.W.3d 46, 66 (Tex. App.—Texarkana 2004, pet. denied, pet. dism'd [2 pets.]) (quoting *Sherrod v. Bailey,* 580 S.W.2d 24, 28 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.)). However, such damages must "be foreseeable, and they must be directly traceable to the wrongful act and result from it." *Metro Nat. Corp. v. Dunham-Bush, Inc.*, 984 F. Supp. 538, 563 (S.D. Tex. 1997) (applying Texas law). "Consequential damages are special damages and must be pleaded and proved separately." *Naegeli Transp. v. Gulf Electroquip, Inc.,* 853 S.W.2d 737, 739 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (citing *Odom v. Meraz,* 810 S.W.2d 241 (Tex. App.—El Paso 1991, writ denied); *see* TEX. R. CIV. P. 56. In the suit at bar, Decker Oaks has specially pleaded damages representing: (1) "[l]ost profits from the sale of Saratoga Springs . . . to [a] third-party buyer,"[37] and (2) the amount of "deficiency claims by the foreclosing lenders who foreclosed on Decker Oaks' interest in the Property." [Docket No. 17, § V].

The Court has previously recognized that Royce Homes is a sophisticated business entity that filed, and refused to remove, the Memorandum of Contract with the intent to preclude the sale of Saratoga Springs. *See* discussion *supra* Part IV(E)(iii). The Court concludes that Royce Homes could not have been oblivious to the effects of such an act. Initially, Royce Homes

---

[36] "[C]onsequential damages are synonymous with special damages." *Hycel, Inc. v. Am. Airlines, Inc.*, 328 F. Supp. 190, 193 (S.D. Tex. 1971) (applying Texas law).
[37] The Court presumes that in using the term "lost profits," Decker Oaks meant the difference between the amount of the liens it maintained on Saratoga Springs and the price that the Bryants were willing to pay for the property ($750,000). *See* [February 15, 2008 Tr. 153:15–154:2].

inevitably recognized that if its actions succeeded in defeating the sale of Saratoga Springs, Decker Oaks would necessarily be denied any profits it hoped to realize on the sale. Further, the Court concludes that Royce Homes was aware of the detrimental effects that the Memorandum of Contract would have on Decker Oaks' financing of Saratoga Springs. As a party with constant involvement in various land transactions, Royce Homes was unavoidably aware that if it precluded Decker Oaks from selling Saratoga Springs, Decker Oaks would encounter cash-flow problems. Further, Royce Homes would have appreciated that such problems could eventually lead to foreclosure on Saratoga Springs and the potential for a deficiency judgment.

Thus, in summation, this Court finds that Royce Homes was aware—both when it filed and refused to remove the Memorandum of Contract—that its actions could lead to Decker Oaks' loss of profits from the sale of Saratoga Springs and Decker Oaks' deficiency judgment after Saratoga Springs was foreclosed on. Moreover, the Court notes the presence of uncontested evidence describing the causal relationship between Royce Homes' actions in regards to the Memorandum of Contract, Decker Oaks' inability to sell Saratoga Springs, and Decker Oaks' damages associated with these events. *See* discussion *supra* Part IV(D)(iii) (describing the Memorandum of Contract precluding Decker Oaks' sale of Saratoga Springs); [February 15, 2008 Tr. 153:13–154:5] (Decker Oaks' lost profits); [February 15, 2008 Tr. 165:1–166:5] (Decker Oaks' deficiency judgment). Therefore, Decker Oaks has established that its asserted consequential damages (lost profits and its deficiency judgment) were "foreseeable, and they [are] directly traceable to the wrongful act and result from it." *See Metro Nat.*, 984 F. Supp. at 563. As such, Decker Oaks' asserted consequential damages are proper.

Further, the record contains uncontroverted evidence on the amount of both grounds of consequential damages. Initially, the Bryants' contract to purchase Saratoga Springs set forth a

purchase price of $4,499,500.  [Royce Homes Ex. No. 29].  Further, uncontroverted testimony established that Saratoga Springs was encumbered by two mortgages:  (1) a $2,650,000 mortgage with Capital One, and (2) a $1,040,000 mortgage with Traditions Bank.  As such, Decker Oaks had $3,690,000 ($2,650,000 + $1,040,000) in outstanding debts associated with Saratoga Springs, and it stood to recognize a profit of $809,500 ($4,499,500 - $3,690,000).  [February 15, 2008 Tr. 152:23–153:18].  Further, uncontroverted evidence establishes that, after both mortgages on Saratoga Springs were foreclosed upon, Decker Oaks faced a $1,500,000 deficiency balance.  [February 15, 2008 Tr. 166:1–25].  Thus, Decker Oaks has properly pleaded and evidenced $2,309,500 ($809,500 + $1,500,000) in damages arising from Royce Homes' tortious interference with an existing contract.

"Post-judgment interest can be recovered on any state court money judgment in Texas." *Fidelity & Deposit Co. of Md. v. Tri-Lam Co., Inc.*, 2007 WL 1452632, at *5 (W.D. Tex. May 15, 2007) (citing TEX. FIN. CODE ANN. § 304.001).  As of May 2008, the interest rate applicable to such judgments was 5.00% compounded annually.  TEX. FIN. CODE ANN. §§ 304.003, 304.006.  Thus, this Court orders that Decker Oaks collect 5.00% post-judgment interest (compounded annually) on its recovery for Royce Homes' tortious interference with an existing contract.

Further, "[t]he Texas Supreme Court has recognized two separate bases for the award of prejudgment interest: (1) an enabling statute; and (2) general principles of equity." *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 499 (5th Cir. 2002) (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998)).  The Texas enabling statute provides for prejudgment interest in "wrongful death, personal injury, or property damage" cases.  TEX. FIN. CODE ANN. § 304.102 (Vernon Supp. 2005).  Because Royce

Homes' tortious interference with an existing contract does not fall within the ambit of this statute, any award of pre-judgment interest is pursuant to the common law. *Johnson & Higgins,* 962 S.W.2d at 530. "[T]he decision to award prejudgment interest is left to the sound discretion of the trial court, which should rely upon equitable principles and public policy in making this decision."[38] *Citizens Nat. Bank v. Allen Rae Invs., Inc.,* 142 S.W.3d 459, 487 (Tex. App.—Fort Worth 2004, no pet.). The common law of Texas provides that pre-judgment interest begins to accrue on the earlier of "(1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *Johnson & Higgins, Inc.,* 962 S.W.2d at 531. Further, pursuant to Texas statute, the rate for equitable pre-judgment interest is the same as post-judgment interest: 5.00%. TEX. FIN. CODE ANN. § 304.003; *Int'l Turbine,* 278 F.3d at 500. Pre-judgment interest should be computed as simple interest. *Id.*

The Court finds that granting pre-judgment interest in this suit would serve equity and public policy by giving Decker Oaks a complete recovery for its injury by recompensing it for the lost use of the money it is receiving as damages for Royce Homes' tortious interference with

---

[38] The Court notes that Texas courts are split over whether pre-judgment interest should be granted in every case or in the trial court's discretion. The Texas Court of Appeals has stated in part:

> There is a split of authority among Texas Courts of Appeals . . . concerning whether an award of pre-judgment interest is mandatory. Some courts . . . have held that pre-judgment interest should be awarded as a matter of course. *See Apache Corp. v. Dynegy Midstream Servs., Ltd. P'ship,* 214 S .W.3d 554, 566 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (stating a prevailing party is awarded pre-judgment interest as a matter of course); *Baker Hughes Oilfield Operations, Inc. v. Hennig Prod. Co.,* 164 S.W.3d 438, 447 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding same). However, the majority of courts . . . have held that awards of pre-judgment interest are within the trial court's discretion. *See, e.g., Citizens Nat'l Bank v. Allen Rae Invs., Inc.,* 142 S.W.3d 459, 487 (Tex. App.—Fort Worth 2004, no pet.) (stating, in a review of the trial court's interest calculations, that where no statute controls the award of pre-judgment interest, the decision to award pre-judgment interest is left to the sound discretion of the trial court); *Marsh v. Marsh,* 949 S.W.2d 734, 744 (Tex. App.—Houston [14th Dist.] 1997, no writ) (applying, in a review of trial court's pre-judgment interest calculations, abuse of discretion standard); *Larcon Petroleum, Inc. v. Autotronic Sys., Inc.,* 576 S.W.2d 873, 879 (Tex. Civ. App.—Houston [14th Dist.] 1979, no writ) (stating, in a review of the trial court's interest calculation, that a trial court is permitted, but not required, to award pre-judgment interest under the authority of a statute, or under an equitable theory, or under both).

*SAP Trading Inc. v. Sohani,* 2007 WL 1599719, at *2 n.5 (Tex. App.—Houston [14th Dist.] June 5, 2007, no pet.) (omission added). However, this Court finds, in its discretion, that pre-judgment interest is appropriate in the suit at bar, and therefore, this split in jurisdiction is of no consequence.

an existing contract. Moreover, the Court notes that Decker Oaks filed its counterclaim—including its counterclaim for tortious interference with an existing contract—against Royce Homes on December 5, 2007. The Court has insufficient evidence to determine which was later: (1) 180 days after the date that Royce Homes received written notice of Decker Oaks' counterclaims; or (2) the date of the filing of the counterclaims. As such, the Court will grant pre-judgment interest—5% simple interest—from December 5, 2007 (the date Decker Oaks' counterclaim was filed).

In summation, this Court finds that Royce Homes is liable to Decker Oaks for $2,309,500 in damages arising from Royce Homes' tortious interference with an existing contract. Moreover, Decker Oaks should collect interest from Royce Homes on this sum. Specifically, Decker Oaks should collect: (1) 5% post-judgment interest, compounded annually, from the date of this Memorandum Opinion; and (2) 5% pre-judgment simple interest from December 5, 2007 until the date of this Memorandum Opinion.

## C. Attorney's Fees

Finally, with respect to attorney's fees, such fees are not awarded to a party who prevails on a slander of title or tortious interference with an existing contract action. *Marcus, Stowell & Beye Gov't Sec., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 234 (5th Cir. 1986) (applying Texas law on tortious interference with an existing contract); *Tex. Am. Corp. v. Woodbridge Joint Venture*, 809 S.W.2d 299, 304 (Tex. App.—Fort Worth 1991, writ denied) (slander of title). Therefore, this Court concludes that Decker Oaks is not entitled to recover its attorney's fees.[39]

---

[39] Under Texas' Declaratory Judgments Act, this Court "may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon Supp. 2007). This act "provides a procedural method for deciding the validity or proper construction of a written instrument or a statute" *Boatman v. Lites*, 970 S.W.2d 41, 42–43 (Tex. App.—Tyler 1998, no pet.) (citation omitted). However, "[t]here is no basis for declaratory relief when a party is seeking in the same action a different, enforceable remedy, and a judicial declaration would add nothing to what would be implicit or express in a final judgment for the enforceable remedy." *Univ. Printing Co. v. Premier Victorian Homes, Inc.*, 73 S.W.3d 283, 296 (Tex. App.—Houston [1st Dist.]

Further, this Court concludes that Royce Homes is not entitled to recover its attorney's fees from Decker Oaks because Royce Homes failed to establish that Decker Oaks materially breached any contract. Further, the Court finds no equitable or just reason to award attorney's fees to Royce Homes. Therefore, there is no basis for recovery of attorney's fees under the common law or sections 37 and 38 of the Texas Civil Practice and Remedies Code, upon which Royce Homes based its request. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 320 (Tex. 2006); Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon Supp. 2007) (granting "reasonable and necessary attorney's fees as are equitable and just"); Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon Supp. 2007) (allowing recovery of attorney's fees for a "valid claim").

## VI.    Conclusion

The Court finds that the Saratoga Springs contract failed for want of mutual assent and because it did not satisfy the statute of frauds. Furthermore, Royce Homes is unable to escape this failure by asserting the affirmative defense of estoppel. As a contract never formed, Royce Homes is entitled to the return of the $25,000.00 in earnest money associated with Saratoga Springs. Royce Homes is therefore entitled to recover the $25,000.00 presently held by Stewart Title. Moreover, the Court finds Royce Homes is liable to Decker Oaks for slander of title and tortious interference with an existing contract, but not for tortious interference with a prospective contract or common law fraud. Royce Homes is liable for $2,309,500 for tortious interference with an existing contract, and a subsequent hearing will be held to establish the extent of Royce Homes' liability for slander of title.

---

2001, pet. denied) (citations omitted). The Court finds that any declaratory relief sought by Decker Oaks would add nothing to the Court's final judgment, and as such, declaratory relief is not proper in the suit at bar. *See* [Docket No. 17, § III(A)]. Therefore, Decker Oaks is not entitled to attorney's fees under the Declaratory Judgments Act. *See Boatman*, 970 S.W.2d at 43 ("It is well settled in Texas that a declaratory judgment may not be used solely as a vehicle to obtain attorney's fees, and it is inappropriate if it will serve no useful purpose." (citations omitted)).

With respect to the Decker Oaks contract, the Court finds that Royce Homes materially breached the contract by failing to purchase its allotment of eighty lots in the Village of Decker Oaks, Section I.  Furthermore, the Court finds that the $62,000.00 in earnest money deposited by Royce Homes secured all of its obligations under this contract.  As such, pursuant to the Decker Oaks contract, Royce Homes forfeits its $62,000.00 earnest money to Decker Oaks; Decker Oaks is entitled to recover the $62,000.00 presently being held by Stewart Title.

A Judgment will be entered on the docket as soon as this Court holds a hearing to determine the amount of damages to be awarded for slander of title.


Signed on this 5th day of June, 2008.


                                                 Jeff Bohm
                                                 U.S. Bankruptcy Judge